NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

VARO, INC., Respondent.
No. 28220
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.
April 20, 1970.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Washington, D. C.,

Elmer P. Davis, Director, Region 16, N. L. R. B., Fort Worth, Tex., for petitioner.

John B. Nelson, Dallas, Tex., John E. Price, Fort Worth, Tex., for respondent.

Before THORNBERRY, CARSWELL and CLARK, Circuit Judges.

THORNBERRY, Circuit Judge.

■ This case is before this Court on application of the National Labor Relations Board pursuant to Section 10(e) of the National Labor Relations Act, 29 U. S.C. § 151 et seq. for enforcement of the Board's order issued on September 17, 1968.[1] The Board found that during an organization compaign the Company violated section 8(a) (1) of the Act by maintaining and enforcing an illegal written no-solicitation rule; promulgating and enforcing an illegal oral no-solicitation rule; coercively interrogating employees; promising its employees economic benefits if they refrained from union activity; threatening employees with reprisals if they chose representation; and representing that the Company would never sign a contract, but if the employees should strike, the Company would immediately replace them or, if unable to secure replacements, would relocate the plant. The Board further found that the Company violated section 8(a) (1) and (3) of the Act by transferring an employee in order to discourage him and other employees from union activity. The Board's order directs the Company to cease and desist from the unfair labor practices found or from in any other manner interfering with its employees' rights under the Act. Affirmatively, the order requires the Company to offer the demoted employee reinstatement to the position of inspector-trainee, to make him whole for any earnings lost because of the discrimina-

---

1. Pursuant to Rule 18 of the Rules of this Court, we have concluded on the merits that this case is of such character as not to justify oral argument and have directed the clerk to place the case on the Summary Calendar and to notify the parties in writing. *See* Murphy v. Houma Well Service, 5th Cir. 1969, 409 F.2d 804, Part I; and Huth v. Southern Pacific Company, 5th Cir. 1969, 417 F.2d 526, Part I.

tion against him, and to post the appropriate notice.[2]

As has been often observed previously, this Court does not sit in de novo review of the Board's findings. We are not to decide this case as if we were sitting as a super trial examiner or a super National Labor Relations Board. Rather, our obligation is to review the entire record with care to determine if there is substantial evidence to support the Board's findings and, if there is, to direct enforcement of the Board's order.

The substantial, though often conflicting, evidence establishes that the events leading to litigation in this case were as follows: During the summer of 1967, the Union[3] began an organizational campaign at the Company's two plants in Mexia, Texas. On August 18, 1967 the Union notified the Company that it represented a majority of its employees. The Company undertook steps to counteract the Union's organization campaign. On August 25, a week after the Union's claim of majority. Company foreman Woods approached employee Smith and told him that he had been observed passing out pledge cards during a work break, that this was against Company policy and the law, and that the practice would have to stop "or else." The following afternoon, Smith was told by a fellow employee that another foreman, Bob Neely, had criticized Smith for talking union during the lunch break Smith brought up the matter to Neely. who told Smith that it was against Company policy to talk union with fellow employees in the shop "whether it was break, lunchtime, or what it was."

On September 6, foreman Johnson approached employee Robert Cherry and asked if Cherry was a "union instigator." Cherry replied that he was an "agitator." Johnson then warned him he was "not to talk about the union on company time," and that while the lunch period was available, Cherry "might get into trouble if [he] talked about the union on coffee breaks because actually the company paid for that time." On September 11, employee Cherry was transferred from the position of inspector-trainee back to lathe operator.

On that same day, employee Smith asked foreman Johnson why Cherry had been transferred. Johnson said that it was none of Smith's business, and Smith replied that he was the union steward representing Cherry and would like an answer. That afternoon, Smith was called to the plant manager's office, where he found the manager and a secretary who took notes of their conversation. The manager asked Smith if he had been talking to Johnson on Company time and Smith answered that he might have gone over the lunch period by one or two minutes. The manager asked Smith if he was posing as a union steward. At that point, Smith requested a "union witness," whereupon employee Taylor was summoned into the room. The plant manager asked: "What do you people want out there?" After a noncommittal response from Smith, the manager said: "If money is all you people are concerned with, you don't have to go through all this trouble to get it."

That same afternoon, employee Collier was called into the plant manager's office. The manager said that he had been informed that Collier "had been conducting union activity on company time that day." Collier denied this, insisting that his activity had been limited to his own time. The manager stated that "any union activity on company time was prohibited."

Sometime in October, foreman Clay told employee Cherry that the employees "would never get a contract if [they] did get into a union." Clay said further

2. The Board set aside the union representation election, in which the employees voted against union representation. The Board decision to set aside the election, however, is not before this Court.

3. International Association of Machinists and Aerospace Workers, AFL–CIO.

that if it were his company and the employees voted union, he would "shut the doors."

A Board-conducted election was held on December 18, 1967. During the week preceding the election, the Company arranged approximately twenty-two meetings with small groups of employees at both of the Company's plants on Company time. The Board found that certain statements and speeches made by Company officers at these meetings constituted violations of the Act. These speeches and the Board's findings concerning them will be discussed later in this opinion.

### The No-Solicitation Rules

The Company's orientation booklet contains a rule prohibiting "[s]olicitation on Company property for any purpose * * * at any time" without permission. The Company admits that this rule as promulgated in the old Company pamphlet is invalid under the Board's rules. The Board did not consider the validity of the promulgation of this no-solicitation rule since it had been promulgated so long before this case arose. The Board did find, however, that the rule as enforced in the pre-election campaign was unlawful. The rule was invoked by foreman Neely when he advised employee Smith that "company policy" prohibited union talk in the plant "whether it was break, lunchtime or what it was * * *"

The Board also found that another no-solicitation rule was announced and enforced against two employees by foremen Woods and Johnson. This rule allowed union talk at lunch time but barred such activity during other work breaks. Thus foreman Woods told employee Smith that he had been observed passing out authorization cards during the break period, that this was against Company policy, and that it would stop "or else." Foreman Johnson told employee Cherry that Cherry could talk about the union during lunch time, but not during coffee breaks. The Board found that the rule, as announced and enforced by foremen Woods and Johnson was unlawful.

It is well established that a company rule that prohibits union solicitation by employees *on non-working time* is presumptively an unwarranted impediment to self organization, and may be found unlawful unless it is shown that there are special circumstances that make the rule necessary in order to maintain production or discipline. *See, e.g.*, Republic Aviation Corp. v. N.L.R.B., 1945, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372; Republic Aluminum Co. v. N.L.R.B., 5th Cir. 1968, 394 F.2d 405, 407; Campbell Soup Co. v. N.L.R. B., 5th Cir. 1967, 380 F.2d 372. There was substantial evidence that the Company was announcing and enforcing rules that prohibited union solicitation by the employees on non-working time. The burden was thus on the Company to demonstrate that those rules were necessary for production or discipline. The record clearly reflects that the Company failed to meet that burden. There was simply no evidence that production or discipline were interrupted or even threatened by the employees' solicitation for the union on non-working time. The findings of the Board concerning the Company's no-solicitation rules must stand.

### The Interrogation of Employee Smith.

As noted earlier, employee Smith was called to plant manager Yandri's office on September 11, and asked if he was "posing" as a union steward. Smith first asked for a witness, but after employee Taylor was brought to the office, Smith declined to answer before speaking to a union representative. The Board found that this was a coercive tactic on the part of the Company. The Company argues that Smith's testimony on this matter is unreliable since Yandri testified that he never made the remarks attributed to him by Smith. It is not

the function of this Court to decide the credibility of conflicting witnesses. The trial examiner, who observed the demeanor of the witnesses, accepted the testimony of employee Smith, and there is nothing in the record to show that he was clearly erroneous in doing so. We accept the trial examiner's credibility resolution. *See* N.L.R.B. v. Soft Water Laundry, Inc., 5th Cir. 1965, 346 F.2d 930, 934.

■■ An act of interrogation is not coercive or intimidating on its face, but may be conducted in such circumstances that it will tend to intimidate or coerce the employees. We are careful to note that the test is whether the questioning tends to be coercive, not whether the employees are in fact coerced. N.L.R.B. v. American Mfg. Co., 5th Cir. 1943, 132 F.2d 740. In order to decide whether the interrogation would tend to coerce the employees, we must look to all the circumstances surrounding the questioning. Several factors should be considered in weighing the lawfulness of company interrogation of employees: (1) The history of the employer's conduct and attitude toward its employees; (2) the nature of the information sought—for example, did the interrogator appear to be seeking information on which to base action against individual employees; (3) the position or office of the interrogator in the company's hierarchy; (4) the place and method of interrogation—was the employee summoned to the boss' office, or was there an atmosphere of "unnatural formality?"; and (5) truthfulness of the reply. N.L.R.B. v. Camco, Inc., 5th Cir. 1965, 340 F.2d 803; Bourne v. N.L.R.B., 2d Cir. 1964, 332 F.2d 47.

Judge Wisdom, in N.L.R.B. v. Camco, *supra,* pointed out that three additional factors might be considered: (1) Whether the employer had a valid purpose for obtaining information concerning the union's strength; (2) whether the employer communicated this purpose to the employees; and (3) whether the employer assured the employees that no reprisals would be taken. *See* Bok, The Regulation of Campaign Tactics in Representation Elections under the National Labor Relations Act, 78 Harvard Law Review 38, 106 (1964).

■ The fact that the interrogation of Smith was conducted by a high-ranking Company officer, in his office, with a secretary present and taking notes, support the Board's finding that the questioning of Smith was coercive. It is obvious that Smith was discomforted by the questioning since he requested a witness and refused to answer Yandri's question even after a witness was obtained. It is also significant that the purpose of Yandri's interrogation was not explained and no assurances against retaliation were given. Also, the questioning came at a time when the Company's foremen had been unlawfully enforcing no-solicitation rules and the Company had been engaging in other coercive activities. In light of these circumstances, we uphold the Board's finding that the Company's questioning of employee Smith violated section 8(a)(1) of the Act.

### Promise of Benefit to Smith

Employee Smith testified that plant manager Yandri asked him, "What do you people want out there?" and then said, "If money is all you people are concerned with, you don't have to go through all of this trouble to get it." The Board found that Yandri's comments, made in the course of an organizing campaign, were a violation of section 8(a)(1) of the Act since they constituted a promise of benefit if the employees would give up organization.

■ The purpose of section 8(a)(1) is to establish "the right of employees to organize for mutual aid without employer interference." Republic Aviation Corp. v. N.L.R.B., 1945, 324 U.S. 793, 798, 65 S.Ct. 982, 985, 89 L.Ed. 1372. Section 8(a)(1) prohibits "not only intrusive threats and promises but also conduct immediately favorable to employees which is undertaken with the express purpose of impinging upon their

freedom of choice for or against unionization and is reasonably calculated to have that effect." N.L.R.B. v. Exchange Parts Co., 1964, 375 U.S. 405, 409, 84 S. Ct. 457, 460, 11 L.Ed.2d 435.

▉ Yandri's comments to Smith, standing alone, might not have been sufficient for a finding of an 8(a) (1) violation. However, Yandri's inferred promise of benefits, coming in the midst of an active and largely unlawful anti-union compaign, suggested "a fist inside the velvet glove" and was likely to give the employees the inference that "the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged." N.L.R.B. v. Exchange Parts Company, *supra*. Therefore, considering the whole record, we uphold the Board's finding that Yandri's comments to Smith constituted a violation of section 8(a) (1) of the Act.

*Threats by Foreman Clay.*

▉ During a discussion about the organizing campaign in October, foreman Clay told employee Cherry that the Union "would never get a contract" even if it were voted in. He continued by saying that "if it was his company and they [the employees] voted union he would shut the doors." Cherry then asked Clay if he thought the Company was that "chicken"; Clay made no reply. While Clay purported to express his own views, the employee might well believe that he was reflecting the views of higher management. The Board could reasonably find that Clay's threat that the Company would never agree to a contract, since it warned of the futility of organization, was a form of restraint prohibited by section 8(a) (1). *See* N. L.R.B. v. Louisiana Mfg. Co., 8th Cir. 1967, 374 F.2d 696. The Board could also reasonably find that Clay's statement about closing the plant violated section 8(a) (1). *See* N.L.R.B. v. Gissel Packing Co., 1969, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547; N.L.R.B. v. Herman Brothers Pet Supply, Inc., 6th Cir.

1963, 325 F.2d 68. The Board's findings on these matters are upheld.

*The Coercive Speeches.*

As noted earlier, the Company arranged a number of meetings with small groups of employees at both plants on Company time. The meetings lasted two to three hours and were attended by the Company's labor relations counsel, its division manager, and a Company attorney. At one such meeting, held on December 16, the labor relations counsel was asked if a signed contract was not better than Company practice. The counsel replied that a union contract "was no better than Varo policy," and that he "would say 'no'" to any union contract. He explained that the "only rights the union had were to talk and the only rights the people had were to strike, and the Company's right was to say no." He also stated that the IAM was known as the "striking union."

When plant manager Parker took over the meeting, he advised the employees that "Varo had a contract to meet and if they got a union in there and there was a strike—well, before anyone could get a contract they would have to strike, and they had a contract to meet and it would be met." Parker emphasized that if there was a strike, replacements would be brought in to take the place of those on strike. Parker continued, "If you are replaced that will not be very good references to get another job."

At another such meeting, plant manager Parker said that a union "couldn't help Varo and that he was there to fight it." For the employees to get a union and get a contract, according to Parker, the employees "would have to strike." In that event, he would immediately seek replacements for the strikers. If it was necessary in order to meet the Company's contracts, he would drive his own trucks and deliver his own products, and if "anyone tried to stop him on the picket line, he would run over them." Labor counsel Price stated that the Union could not help Varo "in any way." He then said that if the Union did come in,

there would be no agreement on a contract, and the employees would have to strike. Immediately, the Company would send out "notices for replacements" for anyone who walked out. In addition to the employees' loss of benefits, such as health insurance, there would be no job recommendations, and their union activity would be a "bad reflection" on their "qualifications" and on their "re-employment ability." Further, Price stressed that the Company had contracts to meet and was going to meet them. If there was a plague or everyone decided to go to a football game, he said, the Company would move to a place where they could get employment to meet their contract. He repeated essentially the same thing at another meeting.

At still another meeting for employees, general foreman Winfrey said, "Once a union is voted in there will be a strike and on the day of the strike an order will go out for your replacement, you will be replaced." According to Company attorney Bennett, "When the Company negotiates it is not going to say 'no' but 'hell, no.'" Employee Donowho suggested that in this event the employees could stage an unfair labor practice strike. Bennett replied, "Yes, you can strike, but it may take two years before a decision comes down and you can't go to work during those two years for Varo. By that time you will probably have found another job but most of you will have lost your cars or homes and you will be looking for other employment." Finally, Bennett said that he felt there would be a long-term strike and the Union and Varo would not get along well after the strike. Near the end of the meeting, Parker took over and said: "I want to stress this point, once the Union is elected in here, there will be a strike and I will replace anyone who goes on strike * * *. Once the Union is elected in there will be a strike and you will be replaced."

It is clear that an employer places unlawful restraints on his employees' section 7 rights when he makes threats to frustrate efforts to agree on a contract in order to goad employees into a strike, N.L.R.B. v. Arkansas Grain Corp., 8th Cir. 1968, 390 F.2d 824; N.L.R.B. v. Louisiana Mfg. Co., supra; when he makes threats to replace strikers immediately and to refuse to take them back, Rice Lake Creamery Co., 131 N.L.R.B. 1270, enf'd 112 U.S.App.D.C. 323, 302 F.2d 908 (1962); and when he makes threats to see that replaced strikers do not find work elsewhere. N.L.R.B. v. Buddy Schoelldopf Products, Inc., 5th Cir. 1969, 410 F.2d 82; N.L.R.B. v. Lifetime Door, 4th Cir. 1968, 390 F.2d 272. The Company spokesmen in this case warned the employees that selecting a union would be "a futile effort" because no agreement would be reached short of a strike and that the plant would be removed if the employees engaged in a strike and the employer was unable to secure replacements. Such threats were unlawful. See N.L.R.B. v. Gissel Packing Co., 1969, 395 U.S. 575, 618, 89 S.Ct. 1918, 23 L.Ed.2d 547; N.L.R.B. v. Buddy Schoellkopf Products, Inc., supra.

The Board properly rejected the Company's defense that the statements made by Parker and Price were legitimate predictions about possible disadvantages of unionization. The Supreme Court has recently articulated the standards by which we are to determine whether a company prediction of the possible effects of unionization is proper and permissible:

> [The employer] may make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization * * * *If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the state-*

*ment is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment* (emphasis added).

N.L.R.B. v. Gissel Packing Co., *supra.* Parker's and Price's suggestions of economic harm due to unionization had the natural tendency to imply retaliation for supporting the Union since those suggestions were not based on "demonstrably probable consequences beyond [the Company's] control." Since the Company emphasized that it alone controlled the benefits of the employment relationship that were threatened by unionization, the employees could have reasonably inferred that their employer was willing to use its economic power to see that its dire predictions came true. Since the statements of the Company spokesmen contained conscious overstatements the Company had reason to believe would mislead its employees, the findings of the Board on this matter must stand. *See* N.L.R.B. v. Dow Chemical Co., 5th Cir. 1969, 420 F.2d 480.

*The Demotion of Employee Cherry.*

 It is settled that an employer violates section 8(a) (3) and (1) of the Act if he transfers an employee from one job or location to another because of the employee's known or suspected union activity. N.L.R.B. v. J. W. Mays, Inc., 2d Cir. 1966, 356 F.2d 693; N.L.R.B. v. Lowell Sun Publishing Co., 1st Cir. 1963, 320 F.2d 835. In the case at hand, the Board found that the Company, having discovered that employee Cherry was a union activist, immediately transferred him out of a job to which he had been recently promoted, a job which gave him an opportunity to spread the union message throughout the plant. We must determine whether there is substantial evidence to support that finding.

Cherry had been working in the Company's production department as a machinist, but, on his request, was transferred to the inspection department to work as a quality control inspector. Cherry was to be on probation for a month and if his work was found unsatisfactory he would be sent back to the production department. After only a few days in his new job, Cherry was transferred back to the production department to work as a machinist. The Company claims that Cherry was demoted because his work as an inspector was unsatisfactory and it was clear to his superiors that he would not be successful at the work of an inspector.

The testimony established that Cherry had made mistakes during the few days he was working as an inspector. Admittedly, however, it takes at least a month to learn whether a trainee inspector will make the grade—a period during which the trainee receives "a lot of help," according to the leadman responsible for the training. During his single week as an inspector, Cherry received no reprimands. On Tuesday of that week, Cherry had admitted to foreman Johnson that he was a Union "agitator." The following Monday, Cherry received notice that he was being transferred because he was not "qualified" to work as an inspector. At the time of the transfer, Chief Inspector Barnett justified the transfer by asserting that he had once seen Cherry read an instrument with one hand in his pocket. It should be noted that Barnett did not correct Cherry at the time he was committing the alleged error. At the hearing, the Company offered several additional reasons for Cherry's transfer, but the Board reasonably discounted them as afterthoughts. The Board observed that the Company's testimony was "framed most precisely to create an aura of wrongdoing on Cherry's part without precisely saying so."

 We recognize that the burden is on the Board to prove and not on the employer to disprove the existence of unlawful motivation in discharging the employee. N.L.R.B. v. Soft Water Laundry, Inc., 5th Cir. 1965, 346 F.2d 930, 936. The Board has sustained its burden. The timing of the transfer—in

the midst of a strenuous anti-union campaign, only a few days following the employee's admission that he was agitating for the union, and after only a week of a month-long training program—is strong indication that the Company was motivated by anti-union animus. While we realize that if "an employee is both inefficient and engaged in union activities, that is a coincidence that does not destroy the just cause for his discharge," N.L.R.B. v. Birmingham Publishing Co., 5th Cir. 1952, 262 F.2d 2, 9, we hold that there is substantial evidence to uphold the Board's finding that employee Smith was not transferred for cause but, rather, was transferred because of his union activity.

The Board's order is in all things to be enforced.