NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

K & K GOURMET MEATS,
INC., Respondent.

No. 80–1231.

United States Court of Appeals,
Third Circuit.

Submitted Under Third Circuit Rule
12(6) Oct. 14, 1980.

Decided Feb. 6, 1981.

Richard A. Cohen, Atty., William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., for petitioner.

Martin Lubow, James A. Prozzi, Lubow & Prozzi, P. C., Pittsburgh, Pa., for respondent.

Before GIBBONS and ROSENN, Circuit Judges, and HANNUM, District Judge.*

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This case comes before us on a petition for enforcement of an order of the National Labor Relations Board ("NLRB" or "Board"), filed pursuant to section 10(e) of the National Labor Relations Act ("Act"), 29 U.S.C. § 160(e). The Board found that K & K Gourmet Meats, Inc. ("K & K" or "Company") committed certain unfair labor practices during the course of a union organizing campaign and directed the Company to recognize and bargain with the United Food and Commercial Workers International Union, AFL–CIO, Food Employees Union Local 590 ("Union"). The practices complained of occurred at the K & K plant, located in Leetsdale, Pennsylvania.

* Honorable John B. Hannum, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

## I.

K & K is a small, family-owned company engaged in processing specialty meats. The business is run by its president, Arthur Katz, assisted by Barbara Weiler, the most senior employee.[1] The Company was founded by Arthur and his brother Leo, who died shortly before the events giving rise to this proceeding. Besides Katz and Weiler, the Company employed fourteen full-time and three part-time workers at all times relevant to this cause.

In October 1978, employee Cheryl Welsh communicated with George Nestler, a Union representative, concerning the possibility of organizing the K & K workforce. A meeting was arranged for the evening of October 23. Eight employees attended the meeting, all of whom signed Union authorization cards at that time. One additional card was obtained the following morning.[2]

Nestler confronted Katz with the cards on October 24, 1978, demanding that K & K recognize the Union as the authorized representative of its employees. Katz refused and referred Nestler to the Company's attorney who indicated that K & K had a good faith doubt that the Union represented an uncoerced majority of the employees.

After work on October 24, Weiler stopped for coffee at a local restaurant with employee Ann Anderson, a personal friend with whom she rode to work. In the course of their conversation, which ranged over various topics, the two women discussed the recent events surrounding the Union's organizing drive. Weiler expressed her opinion that the timing of the campaign was unfortunate, since Leo Katz had recently died and Arthur's wife was ill and hospitalized. Weiler also commented that a previous attempt to organize had been unsuccessful and that she thought the present one would also fail. Weiler then asked Anderson whether a majority of the employees were supporting the Union and

whether she had signed a Union authorization card. Anderson answered "yes" to both inquiries and then asked that the subject be dropped. Weiler immediately honored that request.

On Saturday, October 28, Weiler telephoned Anderson and another employee, Nancy Green, and in the course of her discussion with each, the subject of working conditions came up. Weiler informed both women that Katz would hold a meeting with all the employees and that he would announce a new pay and benefit package. Weiler claimed that the package would include wages comparable to those paid at a larger food processing plant nearby, a hospitalization plan, and a profit-sharing plan.

Katz did, indeed, hold a meeting with all K & K employees on October 30, 1978, at which he discussed hospitalization insurance and profit-sharing. He indicated that he had considered these items as potential employee benefits and that he had taken steps to obtain further information relating to them. Also at this meeting, Katz made several statements to the employees expressing his interest in their concerns and his desire that those concerns be made known to him.

On the evening of October 30, the employees met with George Nestler to discuss Katz' remarks earlier that day. It was decided that Katz was not to be believed and that the employees would strike. Nestler then filed unfair labor practice charges against K & K, alleging various violations of section 8(a)(1) of the Act, as well as a refusal to bargain in violation of section 8(a)(5), 29 U.S.C. § 158(a)(1) & (5).

A hearing was held before an Administrative Law Judge ("ALJ") who, in a decision issued May 29, 1979, found four unfair labor practices on the part of K & K. First, the ALJ found that Ann Anderson was coercively interrogated by Barbara Weiler during their conversation at the coffee shop

---

1. The Board found Weiler to be a "supervisor" within the meaning of 29 U.S.C. § 152(11). The Company does not dispute that finding in this court.

2. Two more cards were obtained on Saturday, October 28, 1978. The Company does not dispute that the number of cards held by the Union was sufficient to demonstrate majority strength.

on October 24. Second, the ALJ found that, during the same conversation, Weiler had threatened Anderson by indicating that her Union activities would be futile. Third, he determined that Weiler, during her telephone conversations with Anderson and Nancy Green on October 28, had unlawfully promised a grant of benefits if the Union were defeated. Finally, the ALJ found that Arthur Katz promised benefits in the form of hospitalization and profit-sharing in exchange for the Union's defeat at his meeting with the employees on October 30. The ALJ specifically recommended dismissal of that portion of the complaint alleging that Katz had solicited employee grievances and expressly or impliedly promised to remedy them. Finally, the ALJ concluded that a bargaining order was not warranted and recommended that K & K be ordered to cease and desist from further violations of the Act and to post appropriate notices.

The Board, reviewing the parties' exceptions to the ALJ's decision, adopted that decision except as it dealt with issues of solicitation of grievances and the need for a bargaining order. The Board concluded that the evidence established that Katz had, in fact, solicited grievances at his October 30 meeting with the employees and "in so doing impliedly promised to remedy them." 245 N.L.R.B. No. 173, slip op. at 3. The Board also found that the Company's purpose underlying its unlawful acts was "to impress upon the employees the fact that they did not need a union to obtain satisfaction of their demands." *Id.* at 5. The Board therefore ordered the Company to cease and desist from engaging in such unfair labor practices, including the refusal to bargain collectively with the United Food and Commercial Workers International Union, AFL–CIO, Food Employees Union Local 590. Affirmatively, the Board ordered the Company to bargain upon request with such union as the exclusive representative of all its employees in the appropriate unit and to post appropriate notices. It is that order which is presently before us for enforcement.

## II.

In viewing the Board's findings of fact, we are limited by statute to a determination whether they are supported by substantial evidence on the record as a whole. 29 U.S.C. § 160(e). *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1950). As to the Board's choice of remedy, we are admonished that "[t]he Board's power is a broad discretionary one, subject to limited judicial review." *Fibreboard Corp. v. NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398, 405, 13 L.Ed.2d 233 (1964), (citing *NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344, 346, 73 S.Ct. 287, 288, 97 L.Ed. 377 (1953)). The Board's choice of remedy "must . . . be given special respect by reviewing courts." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 612 n.32, 89 S.Ct. 1918, 1939 n.32, 23 L.Ed.2d 547 (1969).

These, then, are the parameters of our scrutiny in this case. They do not, however, render us, as judges, "automata." *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 489, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). Courts are still charged with responsibility for seeing that national labor policies are carried out. As the Supreme Court explained in *Universal Camera*, "Congress has imposed on [courts] responsibility for assuring that the Board keeps within reasonable grounds." 340 U.S. at 490, 71 S.Ct. at 465. It is in the exercise of that responsibility that we proceed to examine the decision of the Board on the record before us.

## III.

Of the five unfair labor practices found to have been committed by K & K, two occurred while Barbara Weiler and her personal friend and commuting partner, Ann Anderson, were having coffee after work on October 24. The ALJ heard testimony from both women concerning the content of their conversation in the coffee shop. On direct examination, Anderson summarized the conversation thus:

Well, on the way home that night [October 24], we stopped for coffee, and she said she knew that I had to know what was going on, and I said I did, and she

says, well she was sorry to see that happen, because of all Art's troubles, which was true, and I said I did know, and she says, well, it would never go through, because they had tried it before, and that it had been blocked, and that it would be blocked again, and she asked me how many girls worked there, and did we have a majority, and I said we did, and she asked me if I had signed a card, and I said yes, I had signed a card, and I told her not to ask me no more questions, and not to tell me nothing.

Except for a later concession that Weiler identified Leo Katz as the one who "blocked" the Union in the past, and that he was dead at the time of this conversation, Anderson gave no other testimony on the content of the conversation in the restaurant. Anderson's version of the conversation was generally corroborated by Weiler, who was found by the ALJ "to be a generally credible witness."

█ The Board adopted the ALJ's finding that Weiler's statement to the effect that "the Union was blocked before and would be blocked again" constituted a threat that Anderson's organizing activities would be futile. Neither the ALJ nor the Board supplied any reasoning in support of the conclusion that such conduct constitutes an unfair labor practice or that it was anything more than a permissible expression of opinion. In its brief to this court, however, the General Counsel relies on two fifth circuit cases in support of the Board's finding that a violation occurred. *NLRB v. Henriksen, Inc.*, 481 F.2d 1156 (5th Cir. 1973); *NLRB v. Varo, Inc.*, 425 F.2d 293 (5th Cir. 1970). Both of these cases, however, dealt with employers who had made threats as to what they would do *if* the Union were successful. In *Henriksen*, for example, the Company president stood before the employees and stated that she would bargain with the union in the same way she bargained with her suppliers—that is, in a very "hardnosed" fashion. 481 F.2d at 1160 n.4. The Board found that the employer had misrepresented, through use of her analogy, her obligation to bargain in good faith with the Union, should it be selected. In *Varo*, a

Company foreman told an employee that the Union "would never get a contract." 425 F.2d at 299. The distinction to be drawn, of course, is that in this case, Weiler was speaking about the unlikelihood that the Union would be successful. This could only have been a matter of opinion because the employer in no real way controlled the results of the organizing campaign. In cases such as *Henriksen* and *Varo*, on the other hand, the employer was threatening to be obstructionistic in a matter which does, in fact, require his cooperation and in which a degree of his cooperation is demanded by law. *See also Hedstrom Co. v. NLRB*, 629 F.2d 305, 308 (3d Cir. 1980) (en banc) (*Hedstrom II*) (employer "would never sign a contract with Union"); *NLRB v. Sky Wolf Sales*, 470 F.2d 827, 831 (9th Cir. 1972) (employer "would not sign a contract with the Union"); *NLRB v. Louisiana Manufacturing Co.*, 374 F.2d 696, 701–02 (8th Cir. 1967) (employer "had no intention of signing a contract with a Union"). The most that may be said of Weiler's comments is that she raised the not unexpected likelihood that the employer, exercising its lawful rights, would oppose the Union's drive and that she believed the Company would prevail.

The theory advanced by the Board in this case bears a remarkable similarity to the theory rejected by this court in *NLRB v. Gentithes*, 463 F.2d 557 (3d Cir. 1972). In *Gentithes*, the Board contended that various remarks by an employer to the effect that he opposed unionization "were designed to demonstrate to the employees the futility of any attempt seeking to establish a bargaining representative." 463 F.2d at 560. Chief Judge Seitz, speaking for a unanimous panel, held that "no interpretation of the limited number of such remarks appearing in the record suggests a coercive attempt by the Company to impose upon its employees its own aversion to unionization. . . . Absent a coercive character the statements cannot be considered violative of § 8(a)(1) of the Act." *Id.* In this case, the Board has wholly failed to articulate facts that substantiate the "coercive charac-

ter" of Weiler's appraisal of the Union's prospects. Thus, the remarks fall within the protective cloak of section 8(c), which operates to ensure an effective exchange of information from both union and management in the sphere of labor relations. *NLRB v. Lenkurt Electric Co.*, 438 F.2d 1102, 1108 (9th Cir. 1971). *See also Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin*, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974). Therefore, we reject the Board's conclusion that Weiler's comments to Anderson that the Union would be blocked constituted a violation of section 8(a)(1) as neither supported by law nor by substantial evidence.

■ The second violation found to have occurred during the October 24 conversation was Weiler's interrogation of Anderson regarding her personal position on unionization. The record leaves no doubt that Weiler did question Anderson concerning the Union's majority status and whether she had signed a Union authorization card. However, section 8(a)(1) does not proscribe all inquiries into employees' union sympathies; it is only "when doing so suggests to the employees that the employer may retaliate because of those sympathies" that a violation occurs. *Hedstrom II*, 629 F.2d at 314 (footnote omitted). But the fear of retaliation need not actually appear, the test is whether " 'under the circumstances existing, [the employer's conduct] may reasonably tend to coerce or intimidate employees in the exercise of rights protected under the Act.' " *Id.*, (quoting *NLRB v. Armcor Industries, Inc.*, 535 F.2d 239, 242 (3d Cir. 1976)). Thus, we are not swayed by the General Counsel's argument that Anderson's request that the subject be dropped indicated "that she saw her personal friendship with Weiler as providing no reason for ignoring the inherently coercive nature of the comments and questions being advanced." Nor do we consider in this inquiry Weiler's testimony that Anderson expressed her feeling that the Union drive and the apparent conflict of feelings would not "ruin [their] friendship." The subjective response of the employee is not controlling. *See Local 542, International Union of Operating Engineers v. NLRB*, 328 F.2d 850, 852 (3d Cir. 1964).

■ The objective nature of the inquiry is, however, limited by the specific circumstances in which the interrogation takes place. The Union had already informed the Company that it represented a majority of the employees. Weiler's question was put to a self-described "good friend" with whom she not only regularly rode to work but also engaged in social and recreational activity. Weiler and Anderson shared the ownership of a boat. It was not uncommon for the two women to stop at the restaurant on their way home, nor was it unusual that they should talk about work. Anderson's testimony also shows that the Weilers and the Andersons were social companions, and it was common for them to have dinner together. It also appears that Anderson was comfortable with her friend's position in the company; so comfortable, in fact, that in Anderson's company Weiler endured some dinnertime "teasing" about not walking the picket line when the employees finally went out on strike. Under these circumstances, we fail to discern the coercive element that would transform Weiler's inquiries into unlawful interrogation.

■ The Board also adopted the ALJ's findings that both Weiler and Arthur Katz violated section 8(a)(1) by promising grants of benefits to employees in exchange for defeat of the Union. K & K challenges this finding on the ground that both Weiler, in her phone conversations with Anderson and Green on October 28, and Katz, in his meeting with employees on October 30, emphasized that they were legally unable to promise benefits in exchange for Union opposition and that they were not so doing. The General Counsel argues that this recitation of legal inability was a kind of a "nod and a wink" and will not insulate the Company from its clearly illegal attempts to trade benefits for the Union's defeat. *See, e. g., Michigan Products, Inc.*, 236 N.L.R.B. 1143 (1978); *Montgomery Ward & Co.*, 228 N.L. R.B. 750 (1977). *See also NLRB v. Garry Manufacturing Co.*, 630 F.2d 934, 942 (3d Cir. 1980).

We conclude that substantial evidence supports the Board's findings with respect to both of these violations. In Weiler's telephone conversation with both Anderson and Green on October 30, she initiated a discussion of possible improvements that might occur in their employment situation, specifically mentioning a pay increase, hospitalization benefits and a profit-sharing plan. The conversation appears to have been substantially identical with both women, and it could reasonably be concluded by the listener that she was conveying the Company's proposed bargain to settle the existing "problem" in a manner that would benefit everyone concerned. This is clearly illegal. *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964). For his part, Katz not only described what he had been contemplating in the way of employee benefits, he held those benefits out to the employees with the implied promise that they would be instituted if K & K remained a union-free enterprise. We agree with the Board that employer discussions of potential benefits during a union organizing campaign creates an inference that the benefits do not come without strings attached. That inference becomes more perceptible where, as here, the discussion does not come during a regularly-convened meeting of management and labor and when the proposed benefits are different not only in degree but in kind from those presently enjoyed by the employees.

The final unfair labor practice found by the Board was Katz' solicitation of employee grievances coupled with an implied promise to remedy them. This finding of the Board is directly contrary to an express finding of the ALJ. Although this circumstance does not enlarge our scope of review, the ALJ's finding is a portion of the record in this case and must be considered when making a determination whether the Board finding is supported by substantial evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 493–94, 71 S.Ct. 456, 467, 95 L.Ed. 456 (1951); *Frattaroli v. NLRB*, 590 F.2d 15 (1st Cir. 1978).

■ We begin our discussion of this aspect of the case by noting that a solicitation of grievances is not an unusual occurrence during a union organizing drive. "[A]n organizational drive often comes as a rude shock to an employer, and a simple offer to hear any complaints the employees may have, or to set up machinery to that end, is a natural and non-coercive response." *NLRB v. Rollins Telecasting, Inc.*, 494 F.2d 80, 83 (2d Cir.), *cert. denied*, 419 U.S. 964, 95 S.Ct. 224, 42 L.Ed.2d 178 (1974), *quoted with approval in NLRB v. Eagle Material Handling, Inc.*, 558 F.2d 160 (3d Cir. 1977). For this reason, a "solicitation of grievances is not in and of itself an unfair labor practice." *Hedstrom Co. v. NLRB*, 558 F.2d 1137, 1142 n.12 (3d Cir. 1977) (*Hedstrom I*). "To listen to suggestions does not in and of itself imply that the suggestion will be acted on . . . ." *Visador Co.*, 245 N.L.R.B. No. 71, slip op. at 3 (Sept. 27, 1979).

The Board relied on the testimony of three witnesses, as well as several bits of Katz' own testimony, in finding the solicitation and promise in the instant case. Those witnesses testified that Katz had said he "hoped" to settle disputes and that employees should "try" to resolve their differences with him directly. Such expressions, however, are no more than are reasonably inferred from *any* solicitation of grievances. Indeed, Katz' remarks are less promissory than those of the employer in *Visador*, a case decided just one day after the case at bar, in which the Board declined to find an implied promise to remedy grievances. In *Visador*, the employer stood before the employees and announced: "Whatever problems we've got, we don't need a union to solve them. If you work with me I promise to be fair and to listen to suggestions for improving our plant." 245 N.L.R.B. No. 71, slip op. at 3.

■ A solicitation of grievances becomes an unfair labor practice only when it is accompanied by either an implied or express promise that the grievances will be remedied. *Hedstrom II*, 629 F.2d at 314. This type of conduct is coercive because it lulls employees into believing that they can ob-

tain the benefits being promised by the union without the union's aid. *Tower Enterprises, Inc., d/b/a Tower Records,* 182 N.L.R.B. 382, 387 (1970). However, that policy demands that an actual promise to remedy be found. In the case at bar, we can find only a willingness to listen and to consider. That is not sufficient to constitute a section 8(a)(1) violation.

 This record will not support a finding that Katz made specific promises to remedy grievances, for it does not appear that any complaints were actually tendered. We do not believe that a general, implied promise that complaints will be considered is sufficient to support a finding of a section 8(a)(1) violation. In every case to which this court is cited in support of the Board's finding in this case, the solicitation of grievances was effective and the employer was found to have responded with a promise. *See NLRB v. Eagle Material Handling, Inc.,* 558 F.2d 160, 162 (3d Cir. 1977) (employer responded to worker complaints about pay by promising package that would be "Cadillac of the industry"); *Landis Tool Co., Division of Litton Industries v. NLRB,* 460 F.2d 23, 24 (3d Cir. 1972) (employees complained to employer who claimed they "could of [*sic*] worked this all out" without a union); *Reliance Electric, Madison Plant Mechanical Drives Division,* 191 N.L.R.B. 44 (1971), *enforced,* 457 F.2d 503 (6th Cir. 1972) (series of 10–15 meetings of employees with management officials at which "gripes" were aired.). *See also Hedstrom II,* 629 F.2d at 314 (employer "promised that [subject matter of grievance] would 'be handled differently' by the company's 'new personnel.'"). Thus, we do not find the Board's conclusion on this matter to be supported by substantial evidence. We agree with the ALJ that "[Katz] told [the employees] he hoped they could resolve their problems together. But such does not amount to unlawful solicitation of grievances."

For the reasons stated above, we conclude that only the Board's findings with respect to promised grants of benefits are supported by substantial evidence on the record as a whole. It remains to determine whether these two violations justify the Board's issuance of a bargaining order in this case and our enforcement of it.

## IV.

All modern-day bargaining orders trace their roots to the landmark case of *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), in which the Supreme Court laid down the ground rules under which the Board could force employers to bargain with unions that had not won representation election. *Gissel* treated three types of situations: (1) "'exceptional' cases marked by 'outrageous' and 'pervasive' unfair labor practices"; (2) "less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes"; and (3) "minor or less extensive unfair labor practices which [have only a] minimal impact on the election machinery." 395 U.S. at 613–15, 89 S.Ct. at 1939–1940. In the first situation, the Board is authorized to issue a so-called *Gissel I* order, which orders recognition and bargaining with a union although it has never demonstrated majority strength through authorization cards or otherwise. *United Dairy Farmers Cooperative Association v. NLRB,* 633 F.2d 1054 (1980). In the second situation, the Board may issue a *Gissel II* order, requiring the employer to bargain with a union that has demonstrated majority strength prior to the commission of the unfair labor practices the order is meant to remedy. *Rapid Manufacturing Co. v. NLRB,* 612 F.2d 144, 148 (3d Cir. 1979). It is clear that it is a *Gissel II* order that we are asked to enforce in this case.

The subject of *Gissel II* remedies was recently discussed by this court in *Hedstrom Co. v. NLRB,* 629 F.2d 305 (3d Cir. 1980) (en banc).[3] In *Hedstrom* the Board

---

3. The dissent suggests that at least a significant minority of the members of this court believe that the Supreme Court in *Gissel* erred in interpreting the National Labor Relations Act to

found that the employer had committed in excess of 40 unfair labor practices, that it had "unlawfully interrogated employees, solicited employee grievances, promised and granted benefits to employees, and threatened employees with discharge, plant closure, reduced benefits, and more onerous work rules." *Id.* at 307. The Board's order was enforced because the case had "all of the elements that . . . are common to those cases in which we have enforced orders to bargain." *Id.* at 312. We also noted that the Company had committed additional violations since we had heard an earlier appeal and that the order was especially appropriate in light of the employer's history of union opposition, demonstrating a propensity to commit unlawful acts.

In *NLRB v. Garry Manufacturing Co.*, 630 F.2d 934 (3d Cir. 1980), this court enforced another bargaining order issued by the Board. In *Garry*, the Board had found that the employer had committed serious unfair labor practices in distributing leaflets that tended to imply a loss of job security and plant closings if the union were elected. Also, the employer had: solicited and expressly promised to remedy employee grievances (to the extent that he had installed a bedside "hotline" when he was ill); removed currently utilized machinery from the plant in an effort to convince employees that he could, and would, move his operations elsewhere; promised employees wage increases if the union were defeated; discriminated against union supporters in disciplinary procedures; and obstructed the Board's investigation of the unfair labor practice charges. Finally, the employer scheduled a family outing for employees at an amusement park for the same day as the union's last organizational meeting before the election.

Obviously, the unfair labor practices in the instant case cannot compare with the numerous and grave violations found to have occurred in *Hedstrom* and *Garry*. Even were we to have upheld *all* the Board's findings, this case at its worst would bear only the resemblance to the other two that "slo-pitch" bears to "hardball." To state the lack of comparability between the cases, however, is to demonstrate that precedents are useful only as very rough guides; the determination is essentially one of fact. It is for this reason that we require the Board to specify the reasoning and findings underlying its issuance of a bargaining order. *NLRB v. Armcor Industries, Inc.*, 535 F.2d 239, 244–45 (3d Cir. 1976). To discover whether the Board was reasonable in its evaluation of the facts of the case is the only task before us.

The ALJ termed the violations he found in this case "minimal." The Board disa-

---

permit bargaining orders as a remedy for unfair labor practices committed during an organizing campaign. (Dissenting op., infra at 470.) The author of this opinion respectfully disagrees with such a suggestion. He believes that the minority neither doubts the primacy of the Supreme Court in interpreting the Act nor disagrees with its interpretation in *Gissel* that the Act permits bargaining orders in appropriate cases. Rather, opposition to the enforcement of a bargaining order stems from the Board's disregard of the delineations of *Gissel* and from the Board's imposition of bargaining orders when unfair labor practices, regardless of their insignificance, occur during an organizing campaign. Contrary to the dissent's suggestion, members of the minority have not consistently voted against enforcement of bargaining orders regardless of the circumstances. In fact, the opinion of the court in *NLRB v. Eagle Material Handling, Inc.*, 558 F.2d 160 (3d Cir. 1977), which enforced the Board's imposition of a bargaining order, was written by the author of

this opinion. Further, he did not object to the decisions of this court in *NLRB v. Daybreak Lodge Nursing & Convalescent Home, Inc.*, 585 F.2d 79 (3d Cir. 1978), and *Kenworth Trucks of Philadelphia v. NLRB*, 580 F.2d 55 (3d Cir. 1978), enforcing bargaining orders. Each of these cases, however, contained substantial evidence of serious violations supporting the Board's determination that "the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by traditional remedies" was slight. In this case, and too often in others, the Board has looked upon a bargaining order as a convenient remedy for minor violations when traditional remedies could be equally as effective and still preserve for employees their statutory right to select their exclusive bargaining agent by a democratic process in an open election. When this has occurred, there has been an unwillingness by some members of the court to enforce the bargaining order award.

greed, calling those acts "serious" and concluding that their occurrence "precludes the holding of a fair election." The Board appears to have grounded its decision that a bargaining order was necessary primarily on its finding that there had been promises of benefits in exchange for the union's defeat, findings which we have upheld. The Board quoted at length from a "promised benefits" case, *Honolulu Sporting Goods Co., Ltd., a subsidiary of Zale Corp.*, 239 N.L.R.B. No. 173 (1979), which taught that "[a]n employer may have the right to persuade the employees that representation is not in their best interests, but it does not have the right to threaten them or confer benefits on them which are designed to influence the employees against choosing a representative. When, as here, an employer does so, free choice in a subsequent election becomes a matter of speculation. . . ." Here, the Board also found that K & K's actions were "designed to impress upon the employees the fact that they did not need a union to obtain satisfaction of their demands." The employer's conduct, the Board found, was such as "to undermine the Union's majority status" and "a bargaining order [was] necessary and appropriate to protect the majority sentiment expressed through authorization cards." With these talismanic words, *Gissel II* was invoked and, in the Board's mind, satisfied.

■ The selection of an exclusive collective bargaining agent is not a game of chance but a matter of the highest importance to employees and employers alike. Legislation and experience indicate that an employee's statutory right to select an exclusive bargaining agent should be determined by democratic process in a free and open election. The Board's responsibility for holding such elections was not meant to be supplanted by the authority found to exist in *Gissel.* Only in exceptional circumstances, where it is obvious that the extensive machinery and power of the NLRB is inadequate to ensure a free election, should employees be denied their right to cast a secret ballot for or against an exclusive bargaining agent.[4] In this case, the Board indulges in the grossest kind of speculation to invoke *Gissel II.* The Supreme Court plainly stated that, before a *Gissel II* order should issue, the Board must make a determination that "the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of

---

4. The dissent submits that against the concern for employers and employees subject to bargaining orders must be weighed "the strong federal policy in favor of the formation of collective bargaining relationships." (Dissenting op., infra at 474.) On the contrary, we believe that the federal policy with respect to the formation of collective bargaining relationships is neutral. We view the thrust of federal policy as the protection "of the right of employees to organize and bargain collectively" when they are so inclined. *See* 29 U.S.C. § 151 (1976). *See also* 29 U.S.C. § 157 (1976). Therefore, Congress in its declaration of national policy encouraging collective bargaining has also stated its policy in "protecting the exercise of workers of full freedom of association, self-organization, and designation of representatives of their own choosing." 29 U.S.C. § 151. Freedom of association and free selection of a bargaining agent, however, may be substantially diminished by dependence on authorization cards.

Cards have inherent uncertainties and risks attached to them. Even when the language is clear and unambiguous, the union solicitor may inform the signer that the card will be used only to obtain an election or merely to show interest in an election and that the language above the signature should be disregarded. *NLRB v. Boyer Bros., Inc.*, 448 F.2d 555 (3d Cir. 1971). It may be accompanied by representations that it is not a final designation until there is an election. *See Amalgamated Clothing Workers v. NLRB*, 365 F.2d 898, 906–08 (D.C. Cir.1966). There may also be misrepresentations, *e. g.*, that a majority of the employees have signed authorization cards when in fact they have not. *See NLRB v. Savair Mfg. Co.*, 414 U.S. 270, 277, 94 S.Ct. 495, 498, 38 L.Ed.2d 495 (1973). The solicitations may also be attended by coercion or threats of reprisals and the employee's signature may not be the free and informed decision made in the privacy of a voting booth. *See Texaco, Inc. v. NLRB*, 436 F.2d 520, 524 (7th Cir. 1971). The Court in *Gissel* recognized that cards are "admittedly inferior to the election process," although they may perhaps be the only way of assuring employee choice when the employer engages in conduct disruptive of the election process. 395 U.S. at 602–03, 89 S.Ct. at 1934. As we note in the text, there is nothing in the record here to indicate that the Board could not conduct a fair election at the K & K plant.

traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order." 395 U.S. at 614–15, 89 S.Ct. at 1940. This is a determination of actual fact on the evidence received in each case. No room is left for automatic formulae under which, for example, one threat, two coerced interrogations and a promise of a wage increase will result in an order while another combination will not. The bargaining order is an extraordinary remedy and, because it operates to disenfranchise the workers in the choice of their representative, it is appropriate only when the harmful effects of that disenfranchisement are outweighed by the positive advancement of the policies underlying federal labor law. We agree with the ALJ and do not believe the Board has struck the appropriate balance in this case.

■ The record demonstrates that K & K's employees were not much impressed by Arthur Katz' speech on October 30. At a meeting that night, they collectively decided that his representations were not to be believed. They struck. Such are not the actions of cowering and coerced workers. Since the only unfair labor practices which we find to have occurred were promises by Weiler and Katz that certain benefits would be granted in exchange for the Union's defeat, and the employees did not believe those promises, we fail to perceive why the effects of those practices cannot be "erased . . . by the use of traditional remedies." Indeed, it appears to us that the effects of the unfair labor practices were easily and speedily erased by the evening of October 30, without any remedial action by the Board. We conclude that there was no basis in fact for the Board's determination that the extreme remedy of a bargaining order was necessary under these circumstances.

The Board's application for enforcement of its order requiring (a) K & K to cease and desist from promising employees benefits to discourage them from engaging in activities on behalf of the Union or any other labor organization; (b) that the Company refrain from in any like or related manner interfering with or restraining employees in the exercise of the rights guaranteed them by section 7 of the Act; and (c) that the Company post appropriate notices, will be enforced. In all other respects, enforcement of the order will be denied.

Each side to bear its own costs.

GIBBONS, Circuit Judge, dissenting:

It is no secret that at least a significant minority of the members of this court believe that the Supreme Court in *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), erred in interpreting the National Labor Relations Act to permit the National Labor Relations Board to enter a bargaining order as a remedy for unfair labor practices committed in the course of an organizing campaign. Nor is it any secret that those judges who are uncomfortable with the *Gissel* construction of the statute have been signalling the Board vigorously that bargaining orders are unwelcome in this circuit. *See, e. g., NLRB v. Armcor Industries, Inc.*, 535 F.2d 239 (3d Cir. 1976); *Hedstrom Co. v. NLRB (Hedstrom I)*, 558 F.2d 1137, 1148 (3d Cir. 1977); *NLRB v. Craw*, 565 F.2d 1267 (3d Cir. 1977); *NLRB v. Garry Mfg. Co.*, 630 F.2d 934, 946 (3d Cir. 1980) (Weis, J., dissenting); *Hedstrom Co. v. NLRB*, 629 F.2d 305, 319 (3d Cir. 1980) (en banc) (Rosenn, J., dissenting); *NLRB v. Permanent Label Corp.*, No. 80–1617 (3d Cir., filed Jan. 8, 1981). At the same time the Board is receiving from a different group of judges on this court a quite different signal. *See, e. g., NLRB v. Armcor Industries, Inc.*, 535 F.2d at 246 (Gibbons, J., dissenting); *Kenworth Trucks of Philadelphia v. NLRB*, 580 F.2d 55 (3d Cir. 1978); *NLRB v. Daybreak Lodge Nursing and Convalescent Home*, 585 F.2d 79 (3d Cir. 1978); *NLRB v. Garry Mfg. Co.*, 630 F.2d 934 (opinion of the court); *Hedstrom Co. v. NLRB*, 629 F.2d 305 (opinion of the court); *NLRB v. Permanent La-*

*bel Corp.*, No. 80–1617, slip op. at 28 (Seitz, C. J., dissenting). Those different signals are that we acknowledge the primacy of the Supreme Court in interpreting the Act, at least until Congress speaks, that we acknowledge the primacy of the Board's role as a fact finder, and that if the Board decides to enter a *Gissel* order we will be satisfied with a statement of reasons reasonably identifying for us the basis, among several permissible bases, for choosing that remedy.

Until this case the guerilla warfare against *Gissel* orders has been carried out by insisting that the Board's opinion writing is so opaque that we cannot understand it, and remanding. *See NLRB v. Permanent Label Corp.*, No. 80–1617, slip op. at 28 (Seitz, C. J., dissenting). With the present majority a new weapon is resorted to. The majority simply substitutes its fact finding for that of the Board. Perhaps the new tactic reflects a conclusion that finally the Board has devised a formula for stating its reasons satisfactorily. I hope so. The Board's statement follows:

> Respondent's unfair labor practices are serious in nature, and began on the day the Union demanded recognition. Its entire course of conduct, which included a promise of a wage increase, promises of better benefits, and solicitation of and a promise to remedy grievances, was designed to impress upon the employees the fact that they did not need a union to obtain satisfaction of their demands.[5]
>
> [5] *Teledyne Dental Products Corp.*, 210 NLRB 435 (1974).
>
> Under the principles set forth in *N. L. R. B. v. Gissel Packing Company, Inc.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), a bargaining order is appropriate where a union's majority is established by cards and the nature and extent of the employer's unfair labor practices render unlikely a free choice by the employees in our election. As previously set forth, Respondent's unfair labor practices were clearly designed to undermine the Un-

ion's majority status. Here, the promises of a wage increase, increased benefits, and new approaches to resolve employee grievances, coupled with the threat that the organizational campaign would be futile, result in giving the employees much if not all of what they were seeking through union representation.

In *Honolulu Sporting Goods Co., Ltd. a subsidiary of Zale Corporation*, 239 NLRB No. 173 (1979), the Board quoted with approval the following statement from *Tower Enterprises, Inc., d/b/a Tower Records*, 182 NLRB 382, 387 (1970), which is directly applicable:

> It is difficult to conceive of conduct more likely to convince employees that with an important part of what they were seeking in hand union representation might no longer be needed. An employer may have the right to persuade the employees that representation is not in their best interests, but it does not have the right to threaten them or confer benefits on them which are designed to influence the employees against choosing a representative. When, as here, an employer does so, free choice in a subsequent election becomes a matter of speculation, so long as the effects of the interference remain unremedied.
>
> Accordingly, we find that a bargaining order is necessary and appropriate to protect the majority sentiment expressed through authorization cards and otherwise to remedy the violations committed.[6]
>
> [6] *Honolulu Sporting Goods Co., Ltd., supra.* See also *Crago Gear & Machine Works*, 236 NLRB No. 65 (1978); *National Care & Convalescent Industries, Inc. d/b/a Elmwood Nursing Home*, 238 NLRB No. 40 (1978).
>
> We find that Respondent's bargaining obligation arose on October 24, 1978, the date of the Union's demand and on which it achieved majority status, inasmuch as Respondent commenced its course of unlawful conduct on or about that date. *Trading Port, Inc.*, 219 NLRB 298 (1975).

For me this statement of reasons is adequate.

Turning to the factual bases for the Board's findings of unfair labor practices, I can do no better than to quote them:

We agree with the Administrative Law Judge that Respondent violated Section 8(a)(1) of the Act by interrogating an employee concerning employee interest in and activity on behalf of the Union, promising employees a wage increase and health insurance and profit-sharing benefits to discourage their interest in or activity on behalf of the Union, and threatening an employee that the employees' activity on behalf of the Union would be futile.[3]

[3] The Administrative Law Judge further found that Respondent did not violate Sec. 8(a)(1) of the Act by changing its method of calculating gross pay for income and social security tax purposes or by assignments of allegedly more arduous work. No exceptions were taken to these findings.

The Administrative Law Judge recommended dismissal of the complaint allegation that Respondent violated Section 8(a)(1) of the Act when President Katz, in a meeting with the employees the week following the Union's demand for recognition, solicited and impliedly promised to remedy employee grievances. We find merit to the General Counsel's exception to this recommendation.

In concluding that there was no solicitation of grievances, the Administrative Law Judge apparently ignored the uncontroverted testimony of three employees, Ann Anderson, Nancy Green, and Evelyn Wirhgt [sic], that Katz stated at the meeting that he wanted the employees to bring their problems to him. Thus, Anderson testified that "Katz said he hoped to settle our disputes among ourselves" and "to try to resolve our problems with him, to come to him and get this settled that way." Similarly, Green testified that "Katz said he didn't realize all our problems we had, or were having, and he felt we could handle this problem between us," and Wright testified that "Katz said he hoped he could work with us better in the future, and he told us

that he hoped he could settle things, without an outside organization." Indeed, Katz testified himself, on direct examination, that he said that he wanted the employees to deal directly with him and "I also told them that in the past, I probably haven't heard them out. . . . I mean just haven't been around enough to hear what's happened, or what should be happening." On cross-examination, he admitted that he told the employees that they could work out their problems better without a third party and that they should bring their problems to him so that they could try to do so.

The Administrative Law Judge did not make any factual findings based on the testimony of these witnesses as to this issue, but the testimony of all four is consistent and mutually corroborative. In addition, Katz' concession that he told the employees to bring their problems to him is clearly an admission against interest. Based on this testimony,[4] we find that Katz solicited employee grievances and in so doing impliedly promised to remedy them. *Reliance Electric Company, Madison Plant Mechanical Drives Division,* 191 NLRB 44, 46 (1971).

[4] It is well settled that the Board has the power to make findings of fact based on the uncontradicted testimony of witnesses whose testimony has been neither credited nor discredited by an administrative law judge. See *Retail Clerks Internationai Association, AFL-CIO, Local 219 (National Food Stores, Inc.),* 134 NLRB 1680, 1683 (1961).

In making this finding, and in adopting the Administrative Law Judge's findings that Katz and Supervisor Barbara Weiler unlawfully promised employees improved benefits to dissuade them from their union activity, we find no merit to Respondent's contention that Weiler and Katz rebutted any inference of promises by stating in their conversations with employees that they could not make such promises. The Administrative Law Judge made no finding regarding Weiler's testimony that she stated in her telephone calls to two employees, in which

she was found to have made promises of increased wages and improved benefits, that Katz could make no promises. Nor did the Administrative Law Judge make any finding either on Katz' testimony on direct examination that during his October 30 speech to the employees he had told the employees he could make no promises, or on Katz' concession on cross-examination that he did not explain to the employees his instructions from his attorney not to make promises. We find it irrelevant in the circumstances of this case whether Weiler or Katz denied the ability to make promises, for as stated in *Michigan Products, Inc.*, 236 NLRB No. 147, ALJD, sl. op., p. 6 (1978): "It is immaterial that an employer professes that he cannot make any promises, if in fact he expressly or impliedly indicates that specific benefits will be granted." See also *Montgomery Ward & Co., Incorporated*, 228 NLRB 750, 757 (1977).

Thus, we have found that Respondent violated Section 8(a)(1) of the Act by interrogating employees concerning union activities; threatening employees that the Union's organizational campaign would be futile; promising to increase wages and benefits; and soliciting employee grievances. However, contrary to the Administrative Law Judge, we find that Respondent's unlawful conduct precludes the holding of a fair election, and warrants the issuance of a bargaining order.

The Union demanded recognition on October 24, 1978. That afternoon, Respondent interrogated a union proponent, and threatened that the organizational campaign would be blocked. True to its word, Respondent announced several days later that it would grant the employees a substantial wage increase. Then, on October 30, Respondent announced that it had been considering a medical insurance plan and a profit-sharing plan. Furthermore, during the October 30 meeting, Respondent's president told the employees that he hoped to settle the problems

"without an outside organization." As previously set forth, we find that, by this latter conduct, Respondent violated Section 8(a)(1) by soliciting and impliedly promising to remedy employee grievances.

A comparison of the well written majority opinion with that of the Board discloses that the majority, looking at the same record evidence, has chosen to draw inferences from that evidence different from those the Board drew. Our scope of review under the National Labor Relations Act does not permit such action. See 29 U.S.C. § 160(e) (1976); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Tri-State Truck Service, Inc. v. NLRB*, 616 F.2d 65, 72 (3d Cir. 1980) (Gibbons, J., dissenting).

Conscientious Board members reading our opinions from *Armcor Industries* in 1976 to *Permanent Label* in 1981 must be puzzled about what they should attempt to do in a *Gissel* bargaining order case to satisfy us. The answer to their puzzlement, I fear, is that for the judges uncomfortable with the *Gissel* interpretation of the statute nothing the Board does will be likely to appear satisfactory. I do not mean to suggest that discomfort over *Gissel* orders is an unreasonable judicial posture. We are all well aware that in recent years labor unions have been winning far fewer contested elections than heretofore. A *Gissel* order insulates a union from the hazards of an election, and arguably tilts the scale too far in the union's favor. But the Supreme Court interpreted the Act in the *Gissel* cases to give the Board that authority, and Congress has not chosen to react. If I were a congressman requested to vote on overruling *Gissel*, I am not sure how I would vote. The opponents of *Gissel* orders point out that they tend to undermine secret balloting in the choice of bargaining representatives. On the other hand, the keystone in the arch of federal labor policy is collective bargaining, which cannot take place until a bargaining representative has been recog-

nized. A card majority is a legitimate means for such recognition. *NLRB v. Atlas Lumber Company*, 611 F.2d 26 (3d Cir. 1979); *Eisenberg v. Hartz Mountain Corp.*, 519 F.2d 138, 143 (3d Cir. 1975); *Suburban Transit Corp. v. NLRB*, 499 F.2d 78, 82–83, 85–86 (3d Cir.), *cert. denied*, 419 U.S. 1089, 95 S.Ct. 681, 42 L.Ed.2d 682 (1974); *NLRB v. Air Master Corp.*, 339 F.2d 553, 556–57 (3d Cir. 1964). If on the basis of a card majority a collective bargaining agreement resulted, we would not be overly concerned about the undermining of secret balloting in the choice of bargaining representatives. Thus one has to take at somewhat less than face value the oft-repeated concern that *Gissel* orders are inimical to the interests of employees. The real concern is for employers, but against that concern must be weighed the strong federal policy in favor of the formation of collective bargaining relationships. *See* 29 U.S.C. § 151 (1976).[1] From that perspective *Gissel* orders do not look quite so threatening. In any event, it is not the role of an intermediate appellate court to substitute its balancing of the competing policies for that of the legislature, in the guise of requiring statements of reasons or of substituting its factual inferences for those made by the Board.

I would enforce the Board's order.

---

1. As stated by Congress in 1935:

Experience has proved that protection by law of the right of employees to organize and bargain collectively safeguards commerce from injury, impairment, or interruption, and promotes the flow of commerce by removing certain recognized sources of industrial strife and unrest, by encouraging practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions, and by restoring equality of bargaining power between employers and employees.

29 U.S.C. § 151 (1976).