**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BOYER BROTHERS, INC., Respondent.**

No. 17843.

United States Court of Appeals, Third Circuit.

Argued June 11, 1971.

Decided Sept. 9, 1971.

---

Corinna Metcalf, Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, William F. Wachter, Jack H. Weiner, Attys., N.L.R.B., Washington, D. C., on the brief), for petitioner.

George V. Gardner, Asa Ambrister, Gardner & Ambrister, Washington, D. C., for respondent.

Before STALEY and ADAMS, Circuit Judges, and GARTH, District Judge.

## OPINION OF THE COURT

GARTH, District Judge.

The question before the Court in this proceeding is the validity in various sets of circumstances of cards signed by employees which purport to authorize a union to represent these employees vis-à-vis their employer. The N.L.R.B. found that a majority of the employees of Boyer Brothers, Inc. (hereinafter referred to as the Company) validly authorized The Bakery and Confectionery Workers' International Union of America, Local No. 12 (hereinafter referred to as the Union) to represent them. The Board petitions this Court [1] for enforcement of an N.L.R.B. order which prohibits the Company from engaging in specified unfair labor practices designed to prevent unionization of its employees and which compels the Company to bargain with the Union.

In May, 1966 the Union began a drive to organize the employees of the Company and on July 7, 1966 requested the Company to engage in collective bargaining. The Union claimed it possessed at that time authorization cards from a majority of the employees in the appropri-

---

1. Jurisdiction rests upon Section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160 (e).

ate unit. The Company, however, refused to recognize the Union. On August 17, 1966 an election was held to determine the status of the Union. The Union was defeated by a substantial margin.

The Union filed a charge with the N.L.R.B. shortly after the election. On April 3, 1967 hearings began before the trial examiner at which many of the employees of the Company testified and were subject to cross-examination. After the issuance of the trial examiner's decision on October 26, 1967, the Company moved on December 13, 1967 to reopen the record to present newly discovered evidence. On April 5, 1968 the N.L.R.B. denied the Company's motion and adopted the findings and affirmed the rulings of the trial examiner. On that date the N.L.R.B. ordered that the representation election be set aside because of specified unfair labor practices,[2] and that the Company be required to bargain with the Union on the basis of the Union's designation on a majority of valid cards signed by the employees.

The N.L.R.B. petitioned this Court for enforcement of its order of April 5, 1968. On August 18, 1969 this Court remanded the entire case for reconsideration by the Board in the light of the landmark case of N. L. R. B. v. Gissel Packing Co., et al., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547, reh. denied, 396 U.S. 869, 90 S.Ct. 35, 24 L.Ed.2d 123 (1969). In its Supplemental Decision and Order of March 3, 1970, the N.L.R.B. reaffirmed its initial decision, stating that "the unambiguous cards validly executed by a majority of the employees in the unit

represent a more reliable measure of employee desires on the issue of representation than would a rerun election." The Board ruled that the Company's unfair labor practices were so substantial and pervasive and had so damaging an impact upon election processes that a rerun election would have been ineffective and unreliable.

In its Statement of the Issues before this Court, respondent concedes that substantial evidence supports the N.L.R.B.'s findings that the Company committed unfair labor practices in violation of 29 U.S.C. § 158(a) (1) in all the respects found by the Board. Consequently these finding are deemed conclusive in this proceeding. That part of the order of the N.L.R.B. which prohibits specified unfair labor practices will be enforced.

The remaining determination for this Court is the validity of the provision of the N.L.R.B. order which compels the Company to bargain with the Union. Section 159(a) of Title 29, U.S.C., provides in pertinent part that:

"Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment. * * *"

Whether a majority of the employees in the appropriate unit designated the Union as their representative is the chief contested issue. It is agreed that the bargaining unit at respondent's factory

2. The Company's activities were found by the N.L.R.B. to include the following:
"* * * [T]he Respondent, among other things, promulgated and enforced an unlawful rule against union solicitation at any time on its premises; interrogated employees with respect to their union activities, sympathies, and the activities of other employees; threatened to discharge employees if they continued to engage in union activities; gave employees the impression that it maintained surveillance of their union activities; held out to one employee the prospect of promotion after urging him to consider carefully the consequences of voting for the Union; promised employees improvements in holiday and vacation benefits, and timed announcements of the promised improvements in a manner calculated to influence the outcome of the election; and assigned onerous work to one individual because of his activities on behalf of the Union."

included 207 employees at the time of the Union's demand for recognition. Hence 104 employees must have designated the Union to represent them in bargaining in order to constitute a majority.

The N.L.R.B. found that authorization cards had been validly executed by 106 of the Company's employees. The Company contends that a majority was not obtained by the Union and specifically attacks the Board's inclusion in its count of the cards of 9 employees among those who authorized Union representation.

We find that only two authorization cards were improperly counted (those of employees Burns and Rinker) and conclude that substantial evidence supports the N.L.R.B.'s finding that a majority of the employees in the appropriate unit designated the Union as their representative.

### Card of Harry Burns

The card executed by Harry Burns should not have been counted. Before signing, Burns altered the statement printed on the card. Originally that statement was printed as follows: "I hereby apply for membership in The Bakery and Confectionery Workers International Union of America, Local No. . . . . . . . . . ., and I authorize and designate that Union to represent me for collective bargaining with my employer." Burns lined through the word "membership," substituting another phrase for that word, and thereby caused the card to state: "I hereby apply for information of what you can do for me."

The Board counted Burns' card in accordance with a finding that in leaving intact the entire last clause of the card's statement, Burns knowingly differentiated between union membership, which he did not request, and authorization of the Union as his representative. The record does not present substantial evidence to support this finding.

Effect is to be given to words inserted in the body of an existing form, even if to do so requires a rejection of uncancelled provisions of the original draft. Marine Insurance Company v. M'Lana-han, 290 F. 685 (4th Cir. 1923). On the other hand, a correct construction of an instrument may be obtained by drawing the negative inference that if only one word or phrase of a sentence is stricken, the drafter intended that the others should retain their effect. But this latter proposition assumes that the draftsman has carefully read the sentence and deliberately concluded that the unstricken words express his intention.

Here, however, Burns when asked why he struck one phrase and not the other, stated to the N.L.R.B. trial examiner that "I really didn't give it that much thought I guess." Moreover, Burns' lack of meticulousness is further evidenced by the fact that he struck only the word "membership" and not the remainder of the first clause (" * * * in the Bakery and Confectionery Workers International Union of America, Local No. * * * "). To the extent Burns may have actually thought about the editing of his card, we feel the only realistic interpretation is that offered by Burns: "Well, I thought membership, I thought if you were a member or something they represented you. If you wasn't [sic] a member they didn't."

### Card of Margaret Ebling

Margaret Ebling testified that in signing a card she relied upon a representation that her authorization would remain confidential but stated that this representation was subsequently violated. The fact that the representation as to confidentiality was breached is irrelevant to the reliability, and hence validity, of a union authorization card. N. L. R. B. v. Consolidated Rendering Co., 386 F.2d 699, 702 (2d Cir. 1967); N. L. R. B. v. Southbridge Sheet Metal Works, Inc., 380 F.2d 851, 856 (1st Cir. 1967). The Ebling card was properly counted.

### Card of Gary Runk

The Company asserts as a basis for exclusion that although Gary Runk may have signed a valid authorization card, he did not deliver the card to the Union. Runk's brother testified that he

witnessed the signing of the card and that he heard Runk state his intention to mail the card. Runk himself stated that he mailed the card but was unsure of the addressee. The Runk card was properly counted regardless of the conflicting evidence as to receipt by the Union. Cf. N. L. R. B. v. International Metal Specialties, Inc., 433 F.2d 870, 872 (2d Cir. 1970), cert. denied, 402 U.S. 907, 91 S.Ct. 1378, 28 L.Ed.2d 647 (U.S. April 19, 1971) (held includible a card signed and given to another employee to turn in but never received).

*Card of Sandra Nedimeyer Duffield*

■ The Company contends that it was denied an opportunity to cross-examine Sandra Nedimeyer Duffield, and therefore that her card was not properly authenticated. In an affidavit submitted in support of the Company's motion to reopen, Duffield asserted that she was subpoenaed to appear at the N.L.R.B. hearing but was sent home without testifying by a representative of the General Counsel of the N.L.R.B. The General Counsel's office could not recall such an action on its part. Without resolving this factual issue, we believe this card was nevertheless properly counted. In her affidavit this employee made no averment which would call into question the reliability of her signature. We conclude that it was not an abuse of discretion for the N.L.R.B. to refuse to reopen the record with respect to Sandra Nedimeyer Duffield after hearings had been concluded and the trial examiner had submitted his decision to the Board. Hence, the Duffield card was properly counted.

*Card of Shirley McCachren*

■ Shirley McCachren testified at length as to certain conversations and incidents bearing upon the asserted unfair labor practices of the Company. She also testified with respect to the signing of an authorization card stating that she wanted to join the Union.

The trial examiner rejected her testimony concerning the unfair labor practices as not being credible. He nevertheless counted her card together with those of other employees who had, according to the trial examiner's decision, "credibly attested to their own signatures, the date on which they signed the card, and that they read the card before signing it."

The Company contends that because the trial examiner did not find all of this employee's testimony to be credible, her card should not be counted. This argument overlooks the right of the factfinder to give such credence to any given part of her testimony as he may think it deserves. As stated it was largely in connection with the unfair labor practices that the trial examiner observed that her demeanor was poor. The mere fact she was rejected as a credible witness as to certain parts of her testimony did not compel the trial examiner or the Board to disbelieve every other part of her testimony. The McCachren card was properly counted.

*Cards of Barbara McPhee and Elizabeth Park*

■ The Company's objections to the cards of Barbara McPhee and Elizabeth Park raise issues decided in N. L. R. B. v. Gissel Packing Co., *supra*. In *Gissel* the Supreme Court upheld the *Cumberland Shoe* doctrine[3] of the N.L.R.B. and held that evidence of intention in signing an unambiguous single-purpose union authorization card is not pertinent in the absence of evidence that the signing employee was clearly told that the sole purpose of the card was to bring about an election to determine the status of the Union. The cards signed by the employees in the instant case fall within the *Gissel* rule, since they were unambiguous and were used by the employees solely to apply for union membership and to authorize the Union to represent them in collective bargaining.

Barbara McPhee testified that a coworker asked her "[i]f I wanted to sign

3. Cumberland Shoe Corp., 144 N.L.R.B. 1268 (1963), enf'd N.L.R.B. v. Cumberland Shoe Corp., 351 F.2d 917 (6th Cir. 1965).

the card to get the union in." The co-worker said nothing further. McPhee, however, stated that "I misunderstood, it was my fault. I thought that they [union officials] would come in to talk [and that the card had no further significance]." In these circumstances it was not a mechanical application by the Board of the *Cumberland* rule to count the card. *See* N. L. R. B. v. Gissel Packing Co., 395 U.S. at 608, 90 S.Ct. 35, 24 L.Ed.2d 123. The primary issue in applying the *Cumberland* rule is the affirmative communication by the solicitor of the card to the employee. L. C. Cassidy & Son, Inc. v. N. L. R. B., 415 F. 2d 1358 (7th Cir. 1969). No improper representation was made to McPhee and consequently her card was properly counted.

■ When asked to sign an authorization card, Elizabeth Park was told that " '* * * practically everyone is voting for the Union'." The N.L.R.B. urges that on June 30, 1966, when Mrs. Park appears to have signed the card, a majority of the employees had already signed cards. Assuming this to be true, the ordinary meaning of "practically everyone" is nevertheless not a mere half plus one. The solicitor's assertion was assuredly false in view of the closeness of the count in this case.

The *Gissel* case is not dispositive of the dispute regarding Mrs. Park's card. She testified at the hearing that she would not have signed her card had she known that cards had not yet been signed by practically everyone. While *Gissel* rejects, as unreliable, inquiry into the subjective intention of an employee who has signed a card, 395 U.S. at 608, 90 S.Ct. 35, 24 L.Ed.2d 123, that case does not require that all cards, the signatures of which are subsequently regretted, go unchallenged.

■ The teaching of *Gissel* is that the *purpose* of an employee in signing a card is conclusively presumed to be authorization of the Union to represent him if the card signed so states unambiguously and if no one has explicitly represented to

him that the card has a different purpose. *Gissel* does not deal with misrepresentations regarding matters other than the purpose of the card. Similarly, signatures obtained by duress are not protected from attack by *Gissel*.

■ Misrepresentation that a majority of employees have already signed authorization cards does not in every case require invalidation of a card signed in reliance thereon. In Local 153, I. L. G. W. U. v. N. L. R. B., 443 F.2d 667 (D.C. Cir. 1970), cert. denied, Phillips, Inc., 403 U.S. 905, 91 S.Ct. 2206, 29 L.Ed.2d 681 (1971), it was held that such a misrepresentation is fatal only where it is a means of coercing the employee through fear of majority reprisal. *Accord*, Amalgamated Clothing Workers of America v. N. L. R. B., 124 U.S.App.D.C. 365, 365 F.2d 898, 908 (1966).

The record before this Court does not present any evidence of a deliberate attempt to coerce Park by creating or exploiting a fear of majority reprisal. She testified that she " * * * was anxious to make friends there [at the Company's plant], * * * was new there, scared, and nervous and * * * thought, well, this is the way, you know—[to make friends and get with the group]." There is no evidence, however, that Mary Blake, who solicited the card from Park, threatened her with majority reprisal. In fact Park provoked the alleged misrepresentation by asking, "How are the other girls voting?" The Park card was properly counted.

*Supervisor Solicitation of Cards*

We turn now to the problems raised by the alleged solicitation of signatures of cards by Betty Henry. After the conclusion of the Board's hearings and the submission of the trial examiner's decision, the Company moved to reopen the record on the issue, *inter alia,* of Betty Henry's solicitation. The Company invoked the well-established rule that cards solicited by supervisors are invalid and may not be counted. N. L. R. B. v. Hawthorne Aviation, 406 F.2d 428 (10th Cir. 1969); Pulley v. N. L. R. B., 395 F.2d 870 (6th

Cir. 1968). Although the Company submitted two affidavits which it characterized as newly discovered evidence, the Board in its order of April 5, 1968 denied the Company's motion to reopen on the ground that neither the motion nor the affidavits contained any allegation which, if proved, would affect the outcome of the case.

The reasoning of the Board on this point was set forth in its Supplemental Decision and Order of March 3, 1970:

"Betty Henry solicited signatures on authorization cards and generally manifested her support for the Union before any claim was made by the Respondent that she had supervisory status. Indeed, the Respondent and the Union had stipulated for purposes of the election that Henry, and 11 others employed in the same category, were eligible to vote. Thereafter, the Trial Examiner held, and we agreed, that Henry and the 11 others were supervisors. This precluded the use of their cards in ascertaining the Union's majority status. It is also true that, as a general rule, the Board will not accept cards solicited by supervisors as evidence of majority status. However, in the circumstances of this case, we hold that the cards solicited by Henry may be used for this purpose. The fact that Henry was represented by the Respondent not to be a supervisor, that she was, in fact, discharged for demonstrating her support for the Union, and that the Respondent itself undertook an intensive and unlawful campaign to defeat the Union, rebuts any presumption that Henry's solicitation of cards might have coerced employees into designating the Union against their wishes. See also Aero Corporation, 149 N.L.R.B. 1283, 1286–1287, affd. [Int. Union, United Auto., Aerospace and Agricultural Implement Workers v. N. L. R. B., 124 U.S.App. D.C. 215] 363 F.2d 702 (C.A.D.C.)."

We cannot agree that the circumstances of this case rebut the presumption of an improper effect of Betty Henry's solicitation (to the extent such solicitation actually took place). The rationale for excluding cards solicited by supervisors is that the authority they hold over employees provides " * * * a basis for potential tyranny when improperly exercised by a supervisor thwarted in his aim to obtain union recognition * * *." N. L. R. B. v. Heck's Inc., 386 F.2d 317, 322 (4th Cir. 1967). None of the circumstances referred to by the Board provides a reason for distinguishing Betty Henry's case from the general rule.

■ The trial examiner found that Betty Henry, as a "line-supervisor" before her discharge on July 14, 1966, possessed the power to recommend to management that an employee assigned to her be disciplined or even fired and he found that management frequently adopted such recommendations by supervisors after independent investigation. Henry could send home improperly dressed employees after consultation with management. Moreover, line-supervisors were asked to evaluate employees for purposes of salary increases. The record also shows that Henry had authority to assign employees under her supervision to particular jobs. The supervisor exclusionary rule was designed to invalidate authorization cards obtained through the exploitation of just these types of powers.

■ That the Company at one time may have represented that line-supervisors generally or Betty Henry in particular were eligible to vote[4] does not preclude application of the supervisor exclusionary rule. The Company is not estopped from asserting that Betty Henry is a supervisor by reason of the stip-

4. Betty Henry was not included as an employee eligible to vote in the election in the August 8, 1966 stipulation between the Union and the Company, since she had previously been discharged.

ulation. Montgomery Ward & Co., Inc., 115 N.L.R.B. 645, 647. Nor should the designation given to a worker by his employer be given weight when the proof, as here, shows the actual possession of powers inconsistent with that designation. *Cf.* N. L. R. B. v. Heck's Inc., *supra* (where the court rejected as immaterial the contention that employees did not think of their department heads as "supervisors").

■ The second circumstance mentioned by the Board is that Betty Henry was discharged by the Company for demonstrating her support for the Union. But if before her discharge she possessed power over employees and solicited signatures during this period, her subsequent ouster by the Company is irrelevant. There is no evidence in the record to indicate that any employees whose signatures might have been solicited by Henry knew prior to her discharge that her position in the Company had become so tenuous that she had in effect been deprived of her normal powers as a supervisor.

■ Finally, the Board in finding an exception to the rule, relied on the fact that the Company had undertaken an intensive and unlawful campaign to defeat the Union. But the supervisor exclusionary rule was applied in spite of the same contention in N. L. R. B. v. Heck's Inc., 386 F.2d at 322. An employee solicited by Henry to sign a card for the Union would have known of her power to recommend disciplinary action or a promotion. But while ultimate authority on such questions rested with management, the employee could not reasonably have expected that Henry would no longer exert influence on management after the Union's status had been determined. Further, the employee might have had reason to fear that Henry might harbor grudges against those who did not comply with her requests on behalf of the Union.

Although we find that the Board erred in its reasoning regarding solicitation by supervisors, we nonetheless shall enforce the Board's order, in view of the paucity of evidence of solicitation by Henry. Prior to the Company's motion to reopen, the record contained no evidence of solicitation by Betty Henry of union authorization cards.

■ Henry had testified that she herself had signed such a card, that she went to at least one union meeting before her discharge (and to a total of six or seven meetings), and that before her discharge she obtained 15 to 20 authorization cards from a union organizer for distribution to employees who actively solicited signatures from others.[5] She denied any distribution by her directly to employees for their signatures and denied that she ever solicited signatures. Judy Terry, Gary Neff and Mona Hancock (who, like Betty Henry, was a line-supervisor) received cards from Henry for distribution. They testified at the hearing but provided no evidence that their solicitation activity or their own signing of cards was caused or even encouraged by Betty Henry. Rather, it appears from the only evidence on the issue that "[t]hey [Judy Terry, Gary Neff and Mona Hancock] asked me [Henry] to get them cards to hand out to other people." We hold that this activity did not constitute solicitation on the part of Betty Henry.[6]

Numerous employees testified at the hearing that they had signed authorization cards after solicitation by Judy Terry or another recipient of cards from Henry. None of these employees testi-

---

5. After her discharge Betty Henry apparently distributed a similar number of cards to the same solicitors.

6. The record also indicates that a number of cards were returned to Betty Henry's home after employees had signed them. It does not appear, however, from the record that employees other than the solicitors delivered the signed cards to Henry or knew of her function on behalf of the Union.

fied to any awareness on his part of Henry's participation in the Union drive. Hence, Betty Henry's Union role was unknown to those who might otherwise have been influenced by her position as a supervisor.[7]

*Cards of Karen Reeseman and Carol Rinker*

The only evidence of solicitation by Betty Henry is contained in affidavits submitted after the conclusion of the hearing by the Company upon its motion to reopen the proceedings. In her affidavit of November 25, 1967 Karen Reeseman, an employee of the Company, stated that she signed an authorization card " * * * because Betty Henry * * * persuaded me to do so. She talked with me every day she saw me during the campaign until I finally signed the card. During this period she talked to many people and pressured Carol Rinker into signing a card. She had Carol Rinker scared and Carol came to me and told me about it." Carol Rinker, another employee who signed a card, stated in her affidavit of November 27, 1967: "I was scared from all the pushing to get the cards signed. Romeo, Sandy, and Betty Henry were doing the

pushing. Betty Henry did approach me about the cards at one of the tables."

The Board denied the motion to reopen the proceedings which was based upon these affidavits.[8] That ruling will not be disturbed in the absence of an abuse of discretion. N. L. R. B. v. Yale Manufacturing Company, 356 F.2d 69, 71 (1st Cir. 1966). We conclude that there was no abuse of discretion in the denial of the motion, except with respect to the card of Carol Rinker, which should have been excluded.

Karen Reeseman had testified at the N.L.R.B. hearing on April 5, 1967. The matters set out in her affidavit of November 25, 1967, were known to her at the time of the hearing. Counsel for the Company at the hearing[9] was well aware of the significance of any solicitation by Betty Henry.[10] Counsel's failure to elicit such testimony before the hearing was concluded is unexcused. Certainly, the subject matter of the Reeseman affidavit was not "newly discovered evidence." The interests of fairness and substantial justice did not require the Board to consider the Reeseman affidavit. *Cf.* Partin v. N. L. R. B., 356 F. 2d 512 (5th Cir.), *cert. denied*, 385 U.S. 829, 87 S.Ct. 65, 17 L.Ed.2d 65, *reh. denied*, 385 U.S. 953, 87 S.Ct. 315, 17 L.Ed.2d 232 (1966). Hence the Reeseman card was properly counted.[11]

7. Apart from its contention that particular cards must be excluded because of solicitation by Betty Henry of the employees who signed them, the Company appears to argue that Henry's activity on behalf of the Union taints all the cards comprising the Union's majority. Whatever may be the merit of a taint argument where direct or indirect solicitation has been pervasive, *e. g.*, N.L.R.B. v. Heck's Inc., *supra*, the argument is inappropriate in this case, where no such proofs appear in the record. *Cf.* International Union, United A., A. & A. Imp. Wkrs. v. N.L.R.B. (Aero Corp.), 124 U.S.App. D.C. 215, 363 F.2d 702, cert. denied, 385 U.S. 973, 87 S.Ct. 510, 17 L.Ed.2d 436 (1966).

8. The Company's motion to reopen the record raised, in addition to the issue of solicitation by Betty Henry, the alleged misrepresentation to Sandra Nedimeyer

Duffield, discussed above, and the claim that Robert Shaw signed a card solely to bring about an election. This latter argument was not urged in the Company's brief before this Court and consequently is considered to have been abandoned.

9. After the hearing the Company substituted new attorneys who moved to reopen the proceedings.

10. During the interrogation of Betty Henry at the hearing on April 3, 1967, Mr. First, then counsel for the Company stated: "Oh, this is the very heart of this case. I must know in great detail the extent to which supervisors were engaged in Union activities."

11. One of the circumstances relevant to the Board's exercise of discretion in this regard was the fact that Reeseman's testi-

The affidavit of Carol Rinker, however, should have been considered by the Board, since she had been unable to appear and testify at the hearing due to serious illness which required her hospitalization. Her affidavit sets forth newly discovered evidence which, in these circumstances, required the Board to exercise its discretion to reopen the record. Carol Rinker's card should have been excluded due to improper solicitation.

It does not follow, however, that a new hearing was required at which the several hundred employees of the Company would testify for a second time. *Aero Corp., supra.* Rinker's affidavit shows that her card was improperly solicited by Betty Henry; nothing in her affidavit supports an inference that other cards were so solicited. That "* * * Betty Henry * * * [was] doing the pushing [for cards]," as averred by Miss Rinker, is ambiguous and inconclusive regarding the exposure of employees other than Miss Rinker to solicitation by Betty Henry.

We conclude that the Board's finding that Betty Henry had solicited signatures is not supported by substantial evidence, except in the one instance, discussed above, of Carol Rinker.

Accordingly, after excluding the Burns and Rinker cards, there remain 104 valid authorization cards, which still constitute a majority of the employees in the bargaining unit.[12] The April 5, 1968 order of the N.L.R.B. will therefore be enforced, notwithstanding that our reasoning in reaching this conclusion differs from that of the Board.

The Board may submit a decree in accordance with this opinion.

---

mony at the hearing was extremely weak, culminating in her admission that not all of the contents of an affidavit previously sworn to by her were true.

12. Our decision that a majority (104/207) of the employees signed valid authorization cards makes it unnecessary to consider the Company's contention that a rerun representation election should be held.