# United States Court of Appeals for the Federal Circuit

———————————————

**T.S., BY AND THROUGH HIS PARENTS, GERMAIN SANCHEZ, JENNIFER SANCHEZ,**
*Petitioners-Appellants*

**v.**

**SECRETARY OF HEALTH AND HUMAN SERVICES,**
*Respondent-Appellee*

———————————————

2021-1866

———————————————

Appeal from the United States Court of Federal Claims in No. 1:11-vv-00685-PEC, Judge Patricia E. Campbell-Smith.

———————————————

Decided: May 20, 2022

———————————————

LISA A. ROQUEMORE, Law Office of Lisa A. Roquemore, Rancho Santa Margarita, CA, argued for petitioners-appellants.

HEATHER LYNN PEARLMAN, Vaccine/Torts Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent-appellee. Also represented by BRIAN M. BOYNTON, C. SALVATORE D'ALESSIO, JENNIFER LEIGH REYNAUD.

———————————————

Before MOORE, *Chief Judge*, BRYSON and DYK, *Circuit Judges*.

Opinion for the court filed by *Chief Judge* MOORE.

Dissenting opinion filed by *Circuit Judge* BRYSON.

MOORE, *Chief Judge*.

Trystan Sanchez appeals a decision of the United States Court of Federal Claims that sustained a special master's decision denying Trystan compensation under the Vaccine Act. *Sanchez v. HHS*, 152 Fed. Cl. 782, 784 (2021). For the following reasons, we reverse and remand.

BACKGROUND

I

On February 5, 2009, Trystan Sanchez, then a six-month-old baby, had a well-child check with Dr. Philip Brown. Dr. Brown gave Trystan multiple vaccines, including the DTaP-HepB-IPV vaccine. Hours later, Trystan developed a fever of 102.2°F and was crying a loud, high-pitched cry, as if he was in pain. Trystan was inconsolable and developed a hot lump on his left thigh. Trystan's fever fluctuated over the next few days.

On February 15, 2009, Trystan's fever returned, and he became congested. The next night, his fever rose to 103.2°F, and he cried loudly in a high pitch. When Trystan's father was able to calm him, he would startle awake as if he could not breathe. Trystan kicked and jerked as if he did not want to be held. Trystan also exhibited arm contortions, holding his arms stiffly behind his back. When his father would try to straighten his arm, it would snap back.

On February 17, 2009, Trystan's mother took him to urgent care where he saw Jonathan Luna, a physician assistant. Mrs. Sanchez later testified that she told Mr. Luna

about the arm contortions, but Mr. Luna's notes do not mention them.  Mr. Luna diagnosed Trystan with a "common cold" and "viral syndrome."

According to his family's testimony, Trystan's arm contortions continued during the period immediately following February 16.  Trystan's father, mother, and paternal grandmother all testified that his arm contortions occurred often multiple times a day during this period.  J.A. 630–33; J.A. 518; J.A. 530–31, 578; J.A. 466, 476.  *See also* J.A. 596–97 (Trystan's maternal grandmother testifying that she witnessed an arm contortion in late February 2009).

At his one-year exam in August 2009, Micaela Marin-Tucker, a physician assistant, noted Trystan was developmentally behind and could not stand, crawl, grasp, hold his head up while sitting, or attempt to move his lower extremities.  His mother stated that she noticed a change in his development approximately two to three months earlier.  At this appointment, Trystan received his next round of vaccinations.  Mr. Sanchez testified that shortly thereafter, his arm contortions returned.

Trystan proceeded to have muscle spasms, developmental delays, seizures, dystonia,[1] and other neurologic issues for the next few years.  For years, the precise nature of Trystan's illness eluded his doctors.  Trystan was eventually diagnosed with Leigh's syndrome in late 2014.  Leigh's syndrome is a severe neurological disorder that often presents in the first year of life, is characterized by progressive loss of mental and movement abilities, and typically results in death within "a couple years."  J.A. 40.

---

[1]    Dystonia is characterized by involuntary muscle contractions that cause repetitive movements or abnormal postures and is caused by neurological abnormality or damage.  J.A. 2816.

Genetic testing showed that Trystan has two disease-causing mutations associated with Leigh's syndrome.

## II

In October 2011, Mr. and Mrs. Sanchez petitioned for compensation under the Vaccine Act, 42 U.S.C. § 300aa–1 *et seq.* Despite all the contrary family testimony, and without discussing that testimony, a special master found that Trystan did not have arm contortions until months after his February 2009 vaccination. J.A. 686. However, in his later decision denying compensation, the special master reversed course, crediting Mr. Sanchez's testimony that Trystan had arm contortions on February 16. J.A. 2297 ("[O]n February 1[6], 2009, . . . [h]is arms contorted and he was jerking around."). But the special master also found that those contortions were a symptom of Trystan's cold, not Leigh's syndrome, and that the first sign of Trystan's Leigh's syndrome, the start of "a neurologic decline," likely did not occur "until May 1, 2009, at the earliest." J.A. 106. And because of this multi-month delay in the development of symptoms, the special master found it more likely than not that the vaccine was not a substantial factor in Trystan's Leigh's syndrome. The Claims Court affirmed.

The Sanchezes appealed to this court, and we vacated and remanded, holding that the record did not support the special master's finding that Trystan's arm contortions were a symptom of a cold. *Sanchez v. HHS*, 809 F. App'x 843, 852–53 (Fed. Cir. 2020) (non-precedential). In remanding, we instructed the special master to (1) address if Trystan's arm contortions on February 16, 2009 were evidence of a seizure or dystonia and thus a sign of a neurologic injury; (2) revisit causation and provide a complete analysis of all prongs of the causation analysis; and (3) address if Trystan's genetic mutations were the sole substantial cause of his Leigh's syndrome, including if the timing and severity of Trystan's Leigh's syndrome would have been the same absent the vaccine. *Id.* at 853–54.

On remand, the special master ordered supplemental status reports, directed the parties to provide updated medical records, and allowed the parties to supplement their expert reports. Based in part on that new evidence, the special master found that Trystan's arm contortions on February 16 were not a neurologic abnormality caused by his vaccination or manifestations of a neurological disorder. Again, the special master denied compensation, this time on two grounds: (1) Trystan did not experience neurologic deterioration until many weeks after his February 2009 vaccination and (2) the Secretary established that Trystan's two genetic mutations solely caused his Leigh's syndrome. The Claims Court sustained the special master's decision. Mr. and Mrs. Sanchez appeal. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

In Vaccine Act cases, we review the Claims Court's decisions de novo, "applying the same standard of review that court applied in reviewing the special master's decision." *Milik v. HHS*, 822 F.3d 1367, 1375–76 (Fed. Cir. 2016). Accordingly, we review the special master's legal conclusions de novo and his findings of fact under an arbitrary-and-capricious standard. *Althen v. HHS*, 418 F.3d 1274, 1277–78 (Fed. Cir. 2005); *Porter v. HHS*, 663 F.3d 1242, 1249 (Fed. Cir. 2011).

To prove causation in fact,[2] a claimant must show: (1) a medical theory causally linking the vaccine and the injury; (2) a logical sequence of cause and effect showing the vaccine was the reason for the injury; and (3) a proximate temporal relationship between vaccination and injury. *Althen*, 418 F.3d at 1278. If the claimant meets this burden, he is

---

[2]    Trystan is required to show causation in fact because his claim is "off table," i.e., a claim not listed in 42 U.S.C. § 300aa-14.

entitled to compensation unless the government demonstrates that the injury was caused by factors unrelated to the vaccine.  42 U.S.C. § 300aa–13(a)(1)(B).

## I

The special master's determination that Trystan failed to prove causation in fact turned entirely on his finding that Trystan's February 16 arm contortions were a one-off event.  Based on that finding, the special master concluded that the contortions were not a symptom of a neurologic injury, that "Trystan did not start a neurologic decline until May 1, 2009, at the earliest" (months after his February 2009 vaccination), and, thus, that Trystan failed to satisfy *Althen* prongs two and three.  That finding, however, was arbitrary and capricious.  On the record before us, the only reasonable conclusion is that Trystan's arm contortions continued after February 16 and were a symptom of a neurologic injury.  Accordingly, Trystan satisfied *Althen* prongs two and three and established causation in fact.[3]

There is no dispute that Trystan has Leigh's syndrome and that neurodegeneration is a result of Leigh's syndrome. J.A. 40.  There is likewise no dispute that dystonia (like Trystan's arm contortions) or seizures can be a manifestation of Leigh's syndrome. J.A. 96.  Trystan was vaccinated February 5, 2009 and had a cold on February 16, 2009.  The special master found, based exclusively on Trystan's family's testimony, that Trystan had arm contortions (a seizure-like experience) on February 16, 2009, shortly after his vaccination. J.A. 2297.  The special master also found, based entirely on family testimony, that Trystan was experiencing arm contortions in August 2009 consistent with Leigh's syndrome:  "Some information about Trystan's health before the second set of vaccinations comes from his family's testimony about his behavior

---

[3]    That Trystan satisfied prong one is not in dispute.

during the baby shower on August 9, 2009.  This testimony *credibly* established that Trystan lacked muscle tone and was having arm contortions."  J.A. 108 (emphasis added).  There is no dispute that by August of 2009 his significant developmental delays associated with his Leigh's syndrome were observed and documented.  J.A. 687; Oral Arg. at 30:20–31, 34:28–35:05.

Despite the February arm contortions, the special master found "that Trystan's neurodegeneration began around May 1, 2009" rather than in February.  J.A. 107.  The special master's entire conclusion hinged upon his finding that: "there appears to be no evidence that between February 17, 2009, and at least May 1, 2009, that Trystan suffered a seizure or stroke-like episode.  Trystan did have arm contortions of February 16, 2009.  But, that episode was short-lived, singular, and did not signify a neurologic injury due to vaccination."  J.A. 102.  The special master explained, "it seems unlikely that Trystan would experience an episode of dystonia that is caused by an injury in his basal ganglia one time in February 2009 and not experience any other motor problems for months."  J.A. 98.  The government's expert, Dr. Raymond, testified that "[i]f Trystan were having arm contortions in February 2009 due to Leigh['s] syndrome and basal ganglia injury, they would have been persistent."  J.A. 98.

This entire case turns on a single fact finding by the special master.  The special master found the family's testimony that Trystan had arm contortions on February 16, 2009 credible.  The special master also found that Trystan had arm contortions beginning August 9, 2009 (and continuing thereafter), again based entirely on the family's testimony, which he expressly found to be credible.  However, the special master rejected the testimony from the same family members that the arm contortions continued throughout the relevant period from February 16 to May 1.  And he did so with no particular explanation as to how the former claims regarding arm contortions (February 16 and

August 9) were credible and the identical testimony from the identical witness that there were additional arm contortions between February and May was somehow not credible. Such an inconsistent, unfounded, and entirely unexplained fact finding is arbitrary and capricious.

The relevant record evidence shows that Trystan's contortions persisted after February 16. Mr. Sanchez testified that Trystan continued to have arm contortions multiple times a day in the days, weeks, and months following February 16. J.A. 630–33. Mrs. Sanchez similarly testified that Trystan continued to have arm contortions in the months following the February 16 contortions—sometimes "five to ten times a day." J.A. 518, *accord* J.A. 530–31, J.A. 578. Trystan's paternal grandmother testified that Trystan had arm contortions "approximately three times a day" from February to August. J.A. 466; J.A. 476. Trystan's maternal grandmother testified that approximately two to three days after February 16, she witnessed Trystan contorting his arm when she was attempting to put him in his car seat and she was unable to place his arm behind the seat buckle. J.A. 596–97. And Trystan's aunt testified that when she saw him at a family event in March 2009, he was "so hard [and] so stiff." J.A. 495. None of this testimony was rebutted. Moreover, medical records from November 12, 2009, and August 2, 2010, albeit non-contemporaneous with the events in question, corroborate the family's testimony. J.A. 308, 362. There was no contrary record evidence.

The only reasons the special master articulated for discrediting the family's testimony were that it conflicted with "[t]he absence of notation [of arm contortions] in any of the contemporaneous medical records" and the general assertion that "memories dim with the passage of time." J.A. 683. Given the record in this case, such a conclusion is arbitrary and capricious.

To be sure, the special master was not required to credit this testimony simply because there is no contrary evidence in the record. *See, e.g.*, *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985) ("[A witness'] story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it."); *cf. Trade Well Int'l v. United Cent. Bank*, 825 F.3d 854, 861 (7th Cir. 2016) ("A district court need not have contrary evidence to discredit a witness."). However, the special master here provided no sound basis for discrediting the extensive family testimony regarding the relevant time period between February and May where he expressly credited much of this same testimony at other times.[4] And contrary to the Secretary's arguments, *see* Oral Arg. at 19:20–20:20, 22:45–28:40, 32:25–34:00, no contemporaneous medical record mentioned the February 16 contortions.[5] These fact findings cannot be reconciled.

---

[4] The notes from the visit with Ms. Marin-Tucker in August 2009 indicating that Ms. Sanchez only noticed developmental changes approximately 2–3 months earlier do not contradict the substantial family testimony establishing that Trystan's arm contortions occurred in an even earlier period.

[5] Our court explained in *Kirby v. HHS*, 997 F.3d 1378 (Fed. Cir. 2021), "As the Claims Court has recognized, physicians may enter information incorrectly and 'typically record only a fraction of all that occurs.'" *Id.* at 1383 (quoting *Shapiro v. HHS*, 101 Fed. Cl. 523, 538 (2011)). We agreed with the Claims Court that "the absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance." *Id.* In this case, none of the early medical records mention the arm contortions, but the special master nonetheless found them to have begun on February 16, 2009.

This is an unusual case where a remand is unnecessary because here the special master's finding of arm contortions on February 16, 2009 (and his associated credibility determination) is law of the case. The government did not challenge this fact finding in the prior appeal. The earlier findings stand and the special master's findings that there were no arm contortions in the relevant period between February and May cannot be reconciled with his earlier determinations.

Given the record and the prior findings, there is no basis to reject the evidence that Trystan was experiencing arm contortions throughout the relevant period. It necessarily follows that Trystan's contortions were a sign of a neurologic injury because the Secretary's expert witness and the special master acknowledged as much. The Secretary's expert witness, Dr. Raymond, gave unrebutted testimony that persistent arm contortions are symptomatic of a neurologic injury. J.A. 98 ("If Trystan were having arm contortions in February 2009 due to Leigh['s] syndrome and basal ganglia injury, they would have been persistent and obvious."). And the special master relied entirely upon the alleged lack of persistent contortions to find that the contortions were not a sign of neurologic injury. *Id.* ("[I]t seems unlikely that Trystan would experience an episode of dystonia that is caused by an injury in his basal ganglia one time in February 2009 and not experience any other motor problems for months."). The record provides no alternative explanation for persistent contortions nor did the government argue for any.

Because those contortions began within two weeks of his vaccinations, Trystan has shown a logical chain of cause and effect between his vaccination and his neurodegeneration. *See* J.A. 75 ("[I]f . . . Trystan developed neurodegeneration within a short time (approximately two weeks) after the vaccination, then a 'logical' conclusion might    be    that    the    vaccination    caused    the

neurodegeneration."). Therefore, Trystan has satisfied his burden of showing *Althen* prongs 2 and 3.

## II

As Trystan has met his burden, he is entitled to compensation unless the Secretary establishes the injury was due to factors unrelated to the vaccine. 42 U.S.C. § 300aa–13(a)(1)(B). In that regard, the special master found that Trystan's genetic mutations were the sole substantial cause of his Leigh's syndrome.

There is no evidence, however, that Trystan's mutations would have resulted in the same progression and severity of his Leigh's syndrome absent the vaccine. The special master merely cited a reference describing a child with similar mutations who developed Leigh's syndrome and concluded Trystan's Leigh's syndrome would manifest the same way. J.A. 129–34. At the outset, a single example does not establish the typical progression of a disease and is not "sufficient to disprove a medical theory that a vaccine *can* cause aggravation in *some* patients." *Sharpe v. HHS* 964 F.3d 1072, 1084 (Fed. Cir. 2020). Moreover, the cited reference provides no information on how the subject's disease progressed after manifestation, and the subject's Leigh's syndrome presented at nine months of age. J.A. 126–27. So, at best, the reference merely shows Trystan would have developed Leigh's syndrome at nine months of age absent the vaccine. That says nothing about what caused Trystan's Leigh's syndrome to manifest at six months of age or to progress the way it did. Thus, the government did not meet its burden to establish Trystan's Leigh's syndrome was the result of factors unrelated to the vaccine.

## CONCLUSION

In sum, Trystan has proven causation in fact, and the government has failed to overcome that showing. Accordingly, Trystan is entitled to compensation under the

Vaccine Act. We reverse the decision denying compensation and remand to the special master for the sole issue of damages.

**REVERSED AND REMANDED**

COSTS

Costs to Trystan.

# United States Court of Appeals
# for the Federal Circuit

———————————————

**T.S., BY AND THROUGH HIS PARENTS, GERMAIN
SANCHEZ, JENNIFER SANCHEZ,**
*Petitioners-Appellants*

**v.**

**SECRETARY OF HEALTH AND HUMAN
SERVICES,**
*Respondent-Appellee*

———————————————

2021-1866

———————————————

Appeal from the United States Court of Federal Claims
in No. 1:11-vv-00685-PEC, Judge Patricia E. Campbell-
Smith.

———————————————

BRYSON, *Circuit Judge*, dissenting.

The National Childhood Vaccine Injury Act empowers
the special masters who adjudicate claims under the Act to
exercise broad discretion in evaluating the merits of those
claims. Congress's intent to vest such discretion in the spe-
cial masters is reflected in our standard of review, which
empowers the Court of Federal Claims—and by extension,
this court—to overturn a special master's decision only
when the decision is "arbitrary, capricious, an abuse of dis-
cretion, or otherwise not in accordance with law." 42
U.S.C. §§ 300aa-12(e)(2)(B), 300aa-12(f); *see also Munn v.
Sec'y of Health & Hum. Servs.*, 970 F.2d 863, 870 (Fed. Cir.
1992) (noting that the arbitrary-or-capricious standard is

"well understood to be the most deferential possible"). The court today overturns the special master's factual findings as unsupported. I believe that there is sufficient evidence in the record to support the special master's findings, and that those findings are not arbitrary or capricious.

In vaccine injury cases, "[w]e do not reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses—these are all matters within the purview of the fact finder." *Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1249 (Fed. Cir. 2011). If the special master's findings are "based on evidence in the record that was not wholly implausible, we are compelled to uphold that finding as not being arbitrary or capricious." *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1363 (Fed. Cir. 2000). Most importantly, we do not "second guess" the special master's conclusions, especially where "the medical evidence of causation is in dispute." *Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1338 (Fed. Cir. 2010). In light of those principles, the majority opinion does not give the special master's decision the deference it is due.

I

At the outset, it is important to note that Trystan Sanchez was born with two genetic mutations that caused him to develop Leigh's syndrome, a mitochondrial disorder affecting the central nervous system. In infants with those mutations, Leigh's syndrome typically manifests following a stressor, often a viral infection, within the first 12 months of life. J.A. 2309. Both parties' experts agreed that the mutations predisposed Trystan to developing Leigh's syndrome, but the Sanchezes argued that the stressor that caused the onset of Leigh's syndrome was the series of vaccinations that Trystan received on February 5, 2009. J.A. 47, 118. The question presented by this case is whether Trystan's vaccinations triggered the onset of his Leigh's

syndrome, or whether that condition, to which he was genetically predisposed, was triggered by another stressor, such as one of the periodic colds that he suffered between February and June of 2009.

The focus of the majority's analysis is on whether the evidence showed that Trystan manifested signs of a neurological injury within days of his February 5, 2009, vaccinations. The evidence showed (and it is not disputed) that on February 16, 2009, Trystan was suffering from a cold. Trystan's father testified that while he was trying to comfort Trystan that evening, Trystan contorted his arms and arched his back in an unusual manner. The question that was the subject of much attention during the evidentiary proceedings was whether Trystan's arm contortions on the evening of February 16, 2009, were indicative of neurological injury or were consistent with the cold from which he was suffering at the time.

A

Dr. Gerald Raymond, one of the government's experts, addressed the relationship between the arm contortions and Trystan's cold. In his report, which was in evidence in this case, Dr. Raymond stated that "[t]he events in February around the time of the six month evaluation are more consistent with a viral [upper respiratory infection] and not myoclonic jerks." J.A. 1101. In a supplemental report, Dr. Raymond added that Trystan's arm contortions were "consistent with an uncomfortably ill child who is tired and does not want to be held." J.A. 2737. The special master found Dr. Raymond to be credible and his statements about Trystan's actions on the night of February 16, 2009, to be persuasive evidence that Trystan's behavior on that night was not indicative of a neurological injury.

The special master's finding that Trystan's arm contortions were an isolated event and not evidence of the onset of Leigh's syndrome is further supported by other evidence in the record. First, after seeing Trystan for a cold on April

29, 2009, pediatrician Nabil A. Seleem noted that Trystan "exhibited no neurological symptoms." J.A. 220. Second, at a visit on May 13, 2009, another pediatrician, Philip S. Brown, similarly did not report any neurological symptoms. J.A. 686–87. Third, at an appointment with physician's assistant Micaela Marin-Tucker in August 2009, Trystan's mother reported that "she noticed a change in [Trystan's] development about 2–3 months ago," i.e., in May or June of 2009. J.A. 222. Notably, that statement in Ms. Marin-Tucker's report is inconsistent with Trystan's mother's testimony at the hearing before the special master, where she testified that Trystan's arms contorted "around five to ten times a day" between February 17, 2009, and April 29, 2009. J.A. 518.

In addition to those medical reports, the special master considered Dr. Raymond's expert opinion regarding the likelihood that the arm contortions were a manifestation of a neurological injury. Dr. Raymond noted that "[i]f Trystan were having arm contortions in February 2009 due to Leigh['s] syndrome and basal ganglia injury, they would have been persistent and obvious and it is expected that his attentive parents would have brought it to the attention of his providers as they did for his other illnesses." J.A. 2737–38. Dr. Raymond further stated that arm contortions behind the infant's back manifesting dystonia would not be possible "without appropriate myelination," which, in his view, would have been unlikely at six months of age. J.A. 97.

B

To be sure, there is evidence in the record that could support a contrary conclusion, particularly the testimony from family members regarding Trystan's behavior during the interval between February and May 2009. *See, e.g.*, J.A. 362, 476, 518, 597, 630–33, 717. In addition, the petitioners' expert, Dr. Lawrence Steinman, testified that "arm contortions" can be "intermittent" and "are not a

manifestation of the common cold." *See* J.A. 2813–14. But those conflicts in the evidence were for the special master to resolve, and the special master's decision to credit the evidence that pointed away from the petitioners' theory that Trystan's neurological injury manifested itself shortly after his vaccinations was not arbitrary or capricious.

Nor was it arbitrary or capricious for the special master to credit the testimony of Trystan's father that Trystan was contorting his arm on the night of February 16, 2009, but not to accept the testimony of Mr. Sanchez and other family members that Trystan's arm contortions continued during the months immediately following that incident. It is well established that a fact finder is entitled to "accept those portions of a witness's testimony which it considers credible and reject other portions which it finds to be improbable." *See Rixey v. W. Paces Ferry Hosp., Inc.*, 916 F.2d 608, 616 (11th Cir. 1990); *see also United States v. Boyce*, 564 F.3d 911, 916 (8th Cir. 2009); *United States v. Ware*, 577 F.3d 442, 447 (2d Cir. 2009); *United States v. Dozier*, 162 F.3d 120, 125 (D.C. Cir. 1998); *United States v. De Leon Ruiz*, 47 F.3d 452, 454 (1st Cir. 1995); *United States v. Colston*, 936 F.2d 312, 315 (7th Cir. 1991); *United States v. Cueto*, 628 F.2d 1273, 1275 (10th Cir. 1980); *Conway v. Chem. Leaman Tank Lines, Inc.*, 610 F.2d 360, 367 (5th Cir. 1980); *Carothers v. Rhay*, 594 F.2d 225, 229 (9th Cir. 1979); *NLRB v. Boyer Bros.*, 448 F.2d 555, 561 (3d Cir. 1971); *People v. Mendoza-Balderama*, 981 P.2d 150, 157–58 (Colo. 1999) (collecting cases). And as this court has previously noted, a special master's "assessments of the credibility of the witnesses" are "virtually unchallengeable on appeal." *Lampe*, 219 F.3d at 1362.

In particular, it was within the province of the special master not to credit the lay testimony of the family members where it was in tension with contemporaneous medical records, Dr. Raymond's expert opinion, and other evidence in the case. As to the events of February 16, 2009, the special master credited Dr. Raymond's assessment that

Trystan's behavior could be explained by the discomfort caused by his cold. The special master found the father's testimony regarding the events of that night to be generally plausible and not indicative of the onset of a neurological injury. The special master also credited the family members' testimony that Trystan experienced arm contortions in August 2009 and that those manifestations of dystonia were accompanied by significant developmental delays.

As to the family members' testimony that Trystan experienced continuous arm-contortion incidents between February and May of 2009, however, the special master found that testimony to be in conflict with other evidence in the record. He did so in his initial decision denying compensation, J.A. 2297–98, and he adhered to those findings in his decision following the remand from this court, J.A. 99–107. In light of the record evidence, the special master's conclusions were reasonable. For instance, in their contemporaneous reports, Drs. Seleem and Brown, who saw Trystan in late April and mid-May 2009, did not note the presence of arm contortions or any other neurological symptoms. Nor did their reports reflect that Trystan's parents mentioned the arm contortions.

It is true that, in general, "the absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). However, the fact that neither doctor's contemporaneous report makes any reference to arm contortions or any other neurological symptoms and that those reports did not reflect that Trystan's parents mentioned Trystan's arm contortions is probative of whether the contortions continued after the evening of February 16, 2009. That is especially true in light of Dr. Raymond's testimony that arm contortions due to Leigh's syndrome and basal ganglia injury would have been persistent and obvious, and that if Trystan were experiencing arm contortions attributable to those conditions, his

parents likely would have raised that issue with the pediatricians during their visits in April and May 2009.

Of the evidence relied upon by the special master, the report of Ms. Marin-Tucker regarding her interview with Ms. Sanchez during Trystan's pediatric visit in August 2009 is of particular significance. Ms. Marin-Tucker's notes reflected that Trystan's mother said she had first noted a change in Trystan's development in about April or May of 2009. That observation, which was made closer in time to Trystan's vaccinations than any of the family's later testimony, suggests that Trystan's condition did not manifest itself until well after his February 2009 vaccinations.

On the surface, the reports of other physicians who assessed Trystan's condition after August 2009 appear to corroborate the family's testimony about Trystan's behavior in the weeks following his February 2009 vaccinations. However, those reports regarding the events of early 2009 were based on histories obtained from Trystan's parents, not on the firsthand observations of the treating physicians. *See* J.A. 95, 362. For that reason, it was reasonable for the special master not to attach independent significance to those reports regarding the timing of the onset of Trystan's condition.

II

In summary, given the competing evidence regarding the etiology of Trystan's condition, it was not unreasonable for the special master to conclude that Trystan's Leigh's syndrome did not manifest itself until significantly later than the date of his February 2009 vaccinations, and therefore that no causal relationship was established between the vaccinations and the triggering of Trystan's Leigh's syndrome. J.A. 117. There is ample evidence in the record consistent with those findings. Even if we were applying a "substantial evidence" standard of review, we would be obliged to sustain the special master's decision. *A fortiori*, the special master's weighing of the evidence cannot fairly

be considered arbitrary or capricious.  Moreover, nothing in the special master's analysis was contrary to law, and there is no suggestion that he selectively ignored particular evidence.  The majority disagrees with the special master's conclusion regarding causation in this case.  But that is not enough to justify concluding that the special master's decision was arbitrary or capricious.  Accordingly, I would uphold the decision of the Court of Federal Claims affirming the special master's decision.